# EXHIBIT B



| Case Information Summary for Case Number |
|:---:|
| **2020-L-013307** |

Filing Date: 12/11/2020

Division: Law Division
Ad Damnum: $200000.00

Case Type: OTHER COMMERCIAL LITIGATION
District: First Municipal
Calendar: W

### Party Information

**Plaintiff(s)**
FUNK JUSTIN

**Attorney(s)**
BELLAS WACHOWSKI
15 N NORTHWEST HGWY
PARK RIDGE IL, 60068
(847) 823-9030

FUNK CRAIG
NAXOS HOLDINGS, LLC

**Defendant(s)**     **Defendant Date of Service**     **Attorney(s)**
BANG MICHAEL
CALYX PEAK, INC.
KEUM HOWARD
SCHMULTS ED
THE CALYX PG
HOLDING, LLC

### Case Activity

Activity Date: 12/11/2020     Participant: FUNK JUSTIN

OTHER COMMERCIAL LITIGATION COMPLAINT FILED

Court Fee: 388.00
Ad Damnum Amount: 200000.00

Attorney: BELLAS WACHOWSKI

Activity Date: 12/11/2020     Participant: FUNK JUSTIN

EXHIBITS FILED

Ad Damnum Amount: 200000.00     Attorney: BELLAS WACHOWSKI

| Activity Date: 12/11/2020 | Participant: FUNK JUSTIN |

## CASE SET ON STATUS CALL

Date: 04/07/2021

Court Time: 0930

Judge: SHELLEY DIANE M

| Activity Date: 12/11/2020 | Participant: FUNK JUSTIN |

## CASE SET ON INDIVIDUAL CALENDAR

| Activity Date: 12/21/2020 | Participant: FUNK JUSTIN |

## SUMMONS ISSUED AND RETURNABLE

Attorney: BELLAS WACHOWSKI

| Activity Date: 01/04/2021 | Participant: FUNK JUSTIN |

## AFFIDAVIT FILED

Back to Top

Please note: Neither the Circuit Court of Cook County nor the Clerk of the Circuit Court of Cook County warrants the accuracy, completeness, or the currency of this data. This data is not an official record of the Court or the Clerk and may not be represented as an official court record.

If data does not appear in a specific field, we likely do not have the responsive data in our master database.

FILED
12/21/2020 3:55 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020L013307

FILED DATE: 12/21/2020 3:55 PM   2020L013307

| | |
|---|---|
| 2120 - Served | 2121 - Served |
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| **Summons - Alias Summons** | **(08/01/18) CCG 0001 A** |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Justin Funk and Craig Funk, et al.
_____

(Name all parties)

v.

Case No. 2020-L-013307
_____

The Calyx PG Holding, LLC, et al.
_____

☑ **SUMMONS**   ☐ **ALIAS SUMMONS**

To each Defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons**, not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

**Summons - Alias Summons**        **(08/01/18) CCG 0001 B**

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.

FILED DATE: 12/21/2020 3:55 PM    2020L013307

Atty. No.: __22565__

Atty Name: __Misty Cygan__

Atty. for: __Plaintiffs__

Address: __15 N. Northwest Hwy__

City: __Park Ridge__

State: __IL__    Zip: __60068__

Telephone: __847-823-9034__

Primary Email: __misty@bellas-wachowski.com__

Witness: _____

12/21/2020 3:55 PM IRIS Y. MARTINEZ

DOROTHY BROWN, Clerk of Court

Date of Service: _____
(To be inserted by officer on copy left with Defendant or other person):

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

FILED DATE: 12/21/2020 3:55 PM   2020L013307

## CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

Richard J Daley Center
50 W Washington
Chicago, IL 60602

District 2 - Skokie
5600 Old Orchard Rd
Skokie, IL 60077

District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

District 4 - Maywood
1500 Maybrook Ave
Maywood, IL 60153

District 5 - Bridgeview
10220 S 76th Ave
Bridgeview, IL 60455

District 6 - Markham
16501 S Kedzie Pkwy
Markham, IL 60428

Domestic Violence Court
555 W Harrison
Chicago, IL 60607

Juvenile Center Building
2245 W Ogden Ave, Rm 13
Chicago, IL 60602

Criminal Court Building
2650 S California Ave, Rm 526
Chicago, IL 60608

### Daley Center Divisions/Departments

Civil Division
Richard J Daley Center
50 W Washington, Rm 601
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

Chancery Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

Domestic Relations Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

Civil Appeals
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

Criminal Department
Richard J Daley Center
50 W Washington, Rm 1006
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

County Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

Probate Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

◉ Law Division
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

Traffic Division
Richard J Daley Center
50 W Washington, Lower Level
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

FILED DATE: 12/21/2020 3:55 PM   2020L013307

## <u>SERVICE LIST</u>:

The Calyx PG Holdings, LLC
2 Hampshire Street, Suite 100-B
Foxborough, MA 02035

Calyx Peak, Inc.
c/o The Corporation Trust Company, Registered Agent
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

Howard Keum, Manager
c/o The Calyx PG Holdings, LLC
2 Hampshire Street, Suite 100-B
Foxborough, MA 02035

Ed Schmults, Chief Executive Officer
c/o Calyx Peak, Inc.
2 Hampshire Street, Suite 100-B
Foxborough, MA 02035

Michael Bang, Chief Financial Officer
c/o Calyx Peak, Inc.
2 Hampshire Street, Suite 100-B
Foxborough, MA 02035

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| JUSTIN FUNK and CRAIG FUNK, Individually, and NAXOS HOLDINGS, LLC.<br>      Plaintiffs,<br><br>v.<br><br>THE CALYX PG HOLDING, LLC, a Delaware limited liability company, CALYX PEAK, INC., a Delaware corporation, HOWARD KEUM, individually and as Manager of THE CALYX PG HOLDING, LLC, ED SCHMULTS, individually and CEO of CALYX PEAK, INC., and MICHAEL BANG, individually and CFO of CALYX PEAK, INC.<br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.  2020 L 013307 |

## <u>WAIVER OF SERVICE</u>

To:    Lawrence G. Green
       Burns & Levinson, LLP
       125 High Street
       Boston, MA 02110
       (lgreen@burnslev.com)

I have received your request to waive service of a summons in this action along with a copy of the complaint, a copy of this waiver form, and a prepaid means of returning one signed copy of the form to you. I, or the entities I represent, agree to save the expense of serving a summons and complaint in this case. I understand that I, or the entities I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service. I also understand that I, or the entities I represent, must file and serve an answer or a motion within 30 days from the date this form is executed.  I am authorized to sign on behalf of all Defendants and all of the Defendants' defenses, other than with respect to service of process, are preserved.


Signed: _____

Print: _Lawrence G. Green_____

Date: _12/23/20_____

FILED DATE: 12/11/2020 2:41 PM   2020L013307

FILED
12/11/2020 2:41 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL

11465972

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| JUSTIN FUNK and CRAIG FUNK, Individually and NAXOS HOLDINGS, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.  2020L013307 |
| THE CALYX PG HOLDING, LLC a Delaware limited liability company, CALYX PEAK, INC., a Delaware corporation, HOWARD KEUM, individually and as Manager of THE CALYX PG HOLDING, LLC, ED SCHMULTS, individually and CEO of CALYX PEAK, INC., and MICHAEL BANG, individually and CFO of CALYX PEAK, INC. | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

NOW COME Plaintiffs, JUSTIN FUNK and CRAIG FUNK, individually, and NAXOS HOLDINGS, LLC, by and through their attorneys, BELLAS & WACHOWSKI, and complaining of Defendants, THE CALYX PG HOLDING, LLC, a Delaware limited liability company, CALYX PEAK, INC., a Delaware corporation, HOWARD KEUM, individually and as Manager of THE CALYX PG HOLDING, LLC, ED SCHMULTS, individually and as CEO of CALYX PEAK, INC., and MICHAEL BANG, individually and as CFO of CALYX PEAK, INC., states as follows:

## INTRODUCTION

This derivative action is being brought by holders of convertible promissory notes to remedy and to recover damages sustained as a result of Defendants' breach of contract and

FILED DATE: 12/11/2020 2:41 PM   2020L013307

fraudulent actions relating to materially false and misleading statements or omissions of material information, and Blue Sky law violations, have damaged the individual note holders.   Plaintiffs bring this suit to recover damages relating thereto.

## THE PARTIES

1.     Plaintiff, JUSTIN FUNK, is an individual and resident of Cook County, Illinois.

2.     Plaintiff, CRAIG FUNK, is an individual and resident of the State of Florida.

3.     Plaintiff, NAXOS HOLDINGS, LLC, is a limited liability company registered in the State of Nevada.

4.     Defendant, THE CALYX PG HOLDINGS, LLC, purports to be a Delaware limited liability company.

5.     Upon information and belief, Defendant, THE CALYX PG HOLDINGS, LLC, is not a registered limited liability company in the State of Delaware.

6.     Defendant, CALYX PEAK, INC., is a Delaware corporation registered in the State of Delaware and upon information and belief, does business in the State of Illinois.

7.     Upon information and belief, Defendant, HOWARD KEUM, is a Manager of THE CALYX PG HOLDINGS, LLC.

8.     Upon information and belief, Defendant ED SCHMULTS, is the Chief Executive Officer of CALYX PEAK, INC.

9.     Upon information and belief, Defendant MICHAEL BANK, is the Chief Financial Officer of CALYX PEAK, INC.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the present action under the Illinois Code of Civil Procedure, 735 ILCS 5/209(a)(1) and 5/209(2) by the Company transacting business in the State of Illinois.

FILED DATE: 12/11/2020 2:41 PM    2020L013307

11.     Venue is proper in this county under the Illinois Code of Civil Procedure, 735 ICLS 5/2-101 because the Agreement was executed and performed, in part, in Cook County and the Defendants have transacted substantial business in this County.

## ALLEGATIONS COMMON TO ALL COUNTS

12.     On October 22, 2018, a Convertible Note Purchase Agreement (the "Agreement") was executed by and between Plaintiff, JUSTIN FUNK ("Funk"), and Defendant, THE CALYX PG HOLDINGS, LLC, ("Calyx Holdings").   A true and correct copy of the Agreement is attached hereto marked as "**Exhibit A**" and incorporated herein by reference.

13.     On October 15, 2018, a Convertible Note Purchase Agreement (the "Agreement") was executed by and between Plaintiff, CRAIG FUNK ("Craig"), and Defendant, THE CALYX PG HOLDINGS, LLC, ("Calyx Holdings").   A true and correct copy of the Agreement is attached hereto marked as "**Exhibit B**" and incorporated herein by reference.

14.     On August 20, 2018, a Convertible Note Purchase Agreement (the "Agreement") was executed by and between Plaintiff, NAXOS HOLDINGS, LLC ("Naxos"), and Defendant, THE CALYX PG HOLDINGS, LLC, ("Calyx Holdings").   A true and correct copy of the Agreement is attached hereto marked as "**Exhibit C**" and incorporated herein by reference.

15.     Attached to each of the Agreements are the Convertible Promissory Note (the "Note"). *See* **Exhibit A** of **Exhibit A**, **B** and **C**.

16.     Funk's investment amount totaled TWO-HUNDRED THOUSAND ($200,000.00) DOLLARS and 00/100.

17.     Craig's investment amount totaled TWO-HUNDRED THOUSAND ($200,000.00) DOLLARS and 00/100.

18.     Naxos's investment amount totaled TWO-HUNDRED AND FIFTY THOUSAND ($250,000.00) DOLLARS and 00/100.

FILED DATE: 12/11/2020 2:41 PM    2020L013307

19.     Funk caused TWO-HUNDRED THOUSAND ($200,000.00) DOLLARS and 00/100 to be wired to the account and routing number specified by Calyx Holdings.

20.     Craig caused TWO-HUNDRED THOUSAND ($200,000.00) DOLLARS and 00/100 to be wired to the account and routing number specified by Calyx Holdings.

21.     On October 22, 2018, Naxos caused TWO-HUNDRED AND FIFTY THOUSAND ($250,000.00) DOLLARS and 00/100 to be wired to the account and routing number specified by Calyx Holdings.

22.     The terms of each Note contained a maturity date of 24 months from the date of Note with interest accruing at the rate of ten percent (10%) per annum.

23.     Section 3.1 of the Agreement states:

> 3.1  Closing.  The closing with respect to the transactions contemplated hereby (each a "Closing") shall take place on such one or more dates (each a "Closing Date") as may be determined by the Company either (i) until the Company shall have effectuated Closing for not more than $15,000,000 in original principal amount of the Notes, or (ii) until he Company shall have determined, in its sole discretion, that the offering of the Notes made by this Agreement shall have terminated.  The Initial Closing shall take place on the date hereof or such date when the Company shall have subscribed for Closings of not less than $5,000,000 in original principal amount (the "Initial Closing"). Each Closing shall be held at the offices of the Company or remotely via the exchange of documents and signatures. Each Investor who desires to purchase a Note hereunder shall subscribe thereto by completing, executing and delivering to the Company the signature page attached to this Agreement (each a "Signature Page") and the Accredited Investor Questionnaire attached hereto as Form A, together with payment by check drawn on good funds or by wire transfers of immediately available funds of the original principal amount of the Note so purchased.  As each Closing is completed, the Signature Pages of Investors purchasing Notes at such Closing shall be attached to this Agreement, and Schedule I shall be amended accordingly.  The Company may accept or reject, in whole or in part and at its sole discretion, any offer by an Investor to purchase a Note.

24.     Section 3.2 of the Agreement states:

> 3.2  Issuance and Delivery of Note.  As of the date of each Closing, the Company shall issue and deliver to each Investor an executed Note in the form of Exhibit A in the original principal amount as is set forth on the Signature Page of such Investor delivered to the Company hereunder (which amount shall thereafter be entered by

FILED DATE: 12/11/2020 2:41 PM    2020L013307

the Company on Schedule I opposite such Investor's name). the rights of each Investor with respect to such Investor's Note shall be as set forth in the Note and this Agreement.

25.     Section 4.2 of the Agreement states:

4.2  Optional Conversion.  If the Company does not consummate a Qualified Offering prior to the Maturity Date, the then outstanding principal amount, together with accrued interest, on the Notes may, at the election of the holders of a majority of the outstanding principal amount of all Notes (the "Majority Holders"), be …(ii) paid in full within thirty (30) days following receipt by the Company of such election of the Majority Shareholders.

26.     Section 9.4 of the Agreement states:

9.4 Changes:  The terms and provisions of this Agreement may not be modified or amended, or any of the provisions hereof waived, temporarily, or permanently, except pursuant to a writing executed by duly authorized representatives of the Company and the Majority Holders.

27.     On June 12, 2020, Calyx Peak sent an email with a proposed amendment for the 2018 Convertible Notes, including the Note held by Funk.  A true and correct copy of said email is attached hereto marked as "**Exhibit D**" and incorporated herein by reference.

28.     The revised terms included a new maturity date of December 31, 2023.

29.     On August 25, 2020, Funk sent an email to Michael Bang and Howard Keum requesting the identity and contact information of all note holders pursuant to Section 3.1 of the Agreement. A true and correct copy of said email is attached hereto marked as "**Exhibit E**" and incorporated herein by reference.

30.     On August 25, 2020, Funk was informed via email that the proposed amendment had been approved by a majority of the holders to extend the maturity date.

31.     Funk, Craig, and Naxos had voted against the proposed amendment.

32.     On August 28, 2020, Funk received a response to his August 25th email denying Funk's request.  *See* Exhibit E.

FILED DATE: 12/11/2020 2:41 PM   2020L013307

## COUNT I—BREACH OF CONTRACT
### (THE CALYX PG HOLDINGS, LLC)

33.     Plaintiffs reallege and reincorporate Paragraphs 1 through 32 as though fully set forth herein.

34.     The Contracts are valid and enforceable agreements between the parties.

35.     Plaintiffs performed all of their obligations under the Agreements.

36.     Defendant Calyx Holdings breached the Contracts in numerous ways, including but not limited to:

    a.     Failing and refusing to provide information Plaintiffs was entitled to pursuant to the terms of the Agreement;

    b.     Failing to pay Plaintiffs the Notes in full, plus 10% interest per annum upon the Maturity Date;

    c.     Failing to advise all investors prior to the vote to amendment the maturity date on the Notes that Defendants would be raising an additional $7.5 million dollars through new investors with better terms that the current investors; and

    d.     Failure to adhere to the Illinois Blue Sky laws.

37.     Plaintiffs contacted Defendant regarding these issues and Defendant failed and refused to remedy said breaches.

38.     As a result of the breaches by Defendant, Plaintiffs have been damaged.

    WHEREFORE, Plaintiffs, JUSTIN FUNK, CRAIG FUNK, and NAXOS HOLDINGS, LLC by and through their attorneys, BELLAS & WACHOWSKI, pray for the entry of judgment in their favor and against Defendant, THE CALYX PG HOLDINGS, LLC, in the amount of at least $200,000.00 for Plaintiffs JUSTIN FUNK and CRAIG FUNK, and at least $250,000.00 for

FILED DATE: 12/11/2020 2:41 PM   2020L013307

Defendant NAXOS, plus interest in the amount of 10% per annum, and for any other relief the court deems necessary and just.

## COUNT II—FRAUD IN THE INDUCEMENT
### (All Defendants)

39.     Plaintiffs reallege and reincorporate Paragraphs 1 through 38 as though fully set forth herein.

40.     Defendants made statements of a material fact relating to the Agreement and Note that were false:

  a.  Defendant Keum promised Plaintiffs that the value of the existing assets of the Company were, and always would be, more valuable than the outstanding loans;

  b.  Defendant Keum promised that the value of the assets was never to be surpassed by outstanding debt whereby the Notes could not be repaid on time;

  c.  Defendants overall misrepresented the financial position of the Company; and

  d.  Defendant Keum misrepresented the ability to raise capital with investors always waiting in the wings to invest millions of dollars.

41.     The statements made by Defendants were made for the purpose of inducing the Plaintiff to invest in Calyx Holdings.

42.     The statements by Defendants were false and the Defendants knew the statements were false.

43.     The Plaintiffs were not aware the statements by Defendants were false, and, in fact, reasonably believed the statements to be true and relied on the statements to their detriment.

44.     The Plaintiffs would not have entered into the Agreements but for the material statements by the Defendants.

45.     Plaintiffs has suffered damages as a result of Defendants' material statements.

FILED DATE: 12/11/2020 2:41 PM    2020L013307

WHEREFORE, Plaintiffs, JUSTIN FUNK, CRAIG FUNK, and NAXO HOLDINGS, LLC, by and through their attorneys, BELLAS & WACHOWSKI, pray for the entry of judgment in their favor and against Defendants, in the amount of at least $200,000.00 for Plaintiffs FUNK and CRAIG, and at least $250,000.00 for Plaintiff NAXOS HOLDINGS, LLC, plus interest in the amount of 10% per annum, punitive damages, and for any other relief the court deems necessary and just.

## COUNT III—VIOLATION OF ILLINOIS BLUE SKY LAWS
### (All Defendants)

46.     Plaintiffs reallege and reincorporate Paragraphs 1 through 45 as though fully set forth herein.

47.     The Agreement is a "security" as defined by the Illinois Securities Law of 1953 (the "Act").

48.     Each of the Defendants are considered an "issuer" as defined by the Act.

49.     The Notes sold by Defendants require registration under Section 5 of the Act.

50.     Defendants have violated Section 12 of the Illinois Securities Law of 1953 in the following ways:

      a.     by failing to register as a dealer, internet portal, salesperson, investment advisor, or investment advisor representation;

      b.     by failing to file with the Secretary of State any application, report or document required to be filed under the provisions of the Act;

      c.     by engaging in transaction, practice, and course of business in connection with the sales of securities which worked a fraud or deceit upon the Plaintiffs;

FILED DATE: 12/11/2020 2:41 PM    2020L013307

d.      by obtaining money through the sale of securities by means of untrue statements of material fact and omissions of material fact in order to make statements made, in light of the circumstances under which they were made, not misleading; and

e.      by employing a device and scheme to defraud the Plaintiffs in connection with the sale of securities.

51.    The Defendants' material misstatements and omission of fact were willful and amount to malice, thereby surpassing inadvertence, or neglect.

WHEREFORE, Plaintiffs, JUSTIN FUNK, CRAIG FUNK, and NAXO HOLDINGS, LLC, by and through their attorneys, BELLAS & WACHOWSKI, pray for the entry of judgment in their favor and against Defendants in the amount of at least $200,000.00 for Plaintiffs FUNK and CRAIG, and at least $250,000.00 for Plaintiff NAXOS HOLDINGS, LLC, plus interest in the amount of 10% per annum, punitive damages, costs, reasonable attorneys' fees and for any other relief the court deems necessary and just.

Respectfully submitted,

JUSTIN FUNK, CRAIG FUNK and NAXOS
HOLDINGS, LLC Plaintiffs,

By: /s/ Misty J. Cygan_____
MISTY J. CYGAN,
Attorney for Plaintiffs

George S. Bellas (george@bellas-wachowski.com)
Misty J. Cygan (misty@bellas-wachowski.com)
Bellas & Wachowski
Attorneys for Plaintiff
15 N. Northwest Highway
Park Ridge, Illinois 60068
(847) 823-9034
Cook County Attorney ID# 22565

DocuSign Envelope ID: BD365195-BB70-4JBA-B693-37185D923879

2020L013307

Justin Funk

FILED
12/11/2020 2:41 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL

## THE CALYX PG HOLDINGS, LLC

## CONVERTIBLE NOTE PURCHASE AGREEMENT

10/22/2018 12:24:12 PM PDT

CONVERTIBLE NOTE PURCHASE AGREEMENT, dated as of  [Date]_____ 11465972 (this "**Agreement**"), is entered into by The Calyx PG Holdings, LLC, a Delaware limited liability company with offices located at 2251 N. Rampart Blvd, #370, Las Vegas, NV 89128 (the "**Company**") and the persons listed on **Schedule I** attached hereto (the "**Investors**").

### PRELIMINARY STATEMENT

The Company is conducting a round of financing, raising up to $15,000,000 in the form of unsecured convertible promissory notes (each individually a "**Note**" and collectively, the "**Notes**", with each registered owner of a Note being sometimes referred to as a "**Holder**") that can be convertible into equity in the Company as more specifically set forth herein.

### TERMS AND CONDITIONS

NOW, THEREFORE, in consideration of their mutual covenants set forth herein, the Company and the Investors agree as follows:

1.  Authorization of Notes. Prior to the Initial Closing (as defined in **Section 3.1**), the Company shall have authorized the issuance and sale of Notes of not more than Fifteen Million Dollars ($15,000,000) in original principal amount. The Notes shall be convertible into equity in the Company, all as set forth, and subject to the provisions of, the form of Convertible Note attached as **Exhibit A** and incorporated herein.

2.  Sale and Issuance of Notes. At the Initial Closing, and thereafter at one or more subsequent Closings, the Company shall sell and issue to each Investor, and each Investor shall purchase and acquire from the Company, upon the terms and conditions set forth herein, a Note in the original principal amount as set forth on the Signature Page (defined below) of such Investor attached hereto (which amount shall thereafter be entered by the Company on **Schedule I** opposite such Investor's name) at a purchase price equal to such original principal amount.  Each Investor's obligations hereunder with respect to the purchase of a Note as set forth herein shall be several, and not joint.

3.  Closing of Sale of Notes.

    3.1    Closings. The closings with respect to the transactions contemplated hereby (each a "**Closing**") shall take place on such one or more dates (each a "**Closing Date**") as may be determined by the Company either (i) until the Company shall have effectuated Closings for not more than $15,000,000 in original principal amount of the Notes, or (ii) until the Company shall have determined, in its sole discretion, that the offering of the Notes made by this Agreement shall have terminated.  The Initial Closing shall take place on the date hereof or such date when the Company shall have subscribed for Closings of not less than $5,000,000 in original principal amount (the "**Initial Closing**").  Each Closing shall be held at the offices of the Company or remotely via the exchange of documents and signatures. Each Investor who desires to purchase a Note hereunder shall subscribe thereto by completing, executing and delivering to the Company the signature page attached to this Agreement (each a "**Signature Page**") and the Accredited Investor Questionnaire attached hereto as **Form A**, together with payment by check drawn on good funds or by wire transfer of immediately available funds of the original principal amount of the Note so purchased.  As each Closing is completed, the Signature Pages of Investors purchasing Notes at such Closing shall be attached to this Agreement, and **Schedule I**

**EXHIBIT A**

shall be amended accordingly. The Company may accept or reject, in whole or in part and at its sole discretion, any offer by an Investor to purchase a Note.

      3.2    Issuance and Delivery of Note. As of the date of each Closing, the Company shall issue and deliver to each Investor an executed Note in the form of **Exhibit A** in the original principal amount as is set forth on the Signature Page of such Investor delivered to the Company hereunder (which amount shall thereafter be entered by the Company on Schedule I opposite such Investor's name). The rights of each Investor with respect to such Investor's Note shall be as set forth in the Note and this Agreement.

    4.    Conversion of Notes. In accordance with the terms and conditions set forth in the Notes, the entire amount of outstanding principal and accrued interest under each Note shall be convertible in the event of the closing of a Qualified Offering, as follows:

      4.1    Mandatory Conversion. In the event that the Company completes an offering of equity interests of the Company resulting in aggregate gross proceeds to the Company of at least $10,000,000 (excluding conversion of the Notes or other convertible notes) (a "**Qualified Offering**") prior to the Maturity Date (as defined in the Notes), all Notes shall automatically and simultaneously with the closing thereof be converted (which such conversion shall be mandatory as to all Notes outstanding at the time of such Qualified Offering) into units of equity of the Company issued to purchasers in such Qualified Offering, at a price per unit equal to the per unit price paid by purchasers for such units less a discount of twenty percent (20%), and otherwise on the same economic terms and conditions applicable to the units of equity interest purchased by purchasers in such Qualified Offering, provided, however, that as further protection to the Holders, upon a Qualified Offering, the valuation of the Company shall not exceed the sum of (i) $140,000,000 pre-money valuation plus (ii) to the extent the Company has purchased any equity interests in or, as applicable, the assets of the companies set forth on **Schedule II** attached hereto (the "**Roll-Up Interests**"), the value set forth next to each such purchased interest on **Schedule II** (the "**Roll-Up Value**"), for the sole purpose of calculating the amount of equity to which the Notes are converted into to reflect pre-investment dilution expectations and requirements by the Holders.

      4.2    Optional Conversion. If the Company does not consummate a Qualified Offering prior to the Maturity Date, the then outstanding principal amount, together with accrued interest, on the Notes may, at the election of the holders of a majority of the outstanding principal amount on all Notes (the "**Majority Holders**"), be either (i) converted into the most senior equity then issued by the Company, at the then current valuation of the Company, as determined in good faith by the Company, provided, however, that as further protection to the Holders, the valuation of the Company shall not exceed the sum of (a) the applicable amount with respect to the Notes being converted as set forth on **Schedule III** hereto (the "**Valuation Amount**") plus (b) the aggregate Roll-Up Value for any Roll-Up Interests purchased by the Company on or prior to such conversion, for the sole purpose of calculating the amount of equity to which the Notes are converted into or (ii) paid in full within thirty (30) days following receipt by the Company of such election of the Majority Holders.

      4.3    Change of Control. In the event that the Company effects a Change of Control (as defined below) prior to the Maturity Date, then each Holder shall surrender its Note for, at the election of the Majority Holders, either (i) repayment of outstanding principal and interest under the Notes or (ii) the conversion of the Notes into the most senior equity class or series of securities then issued by the Company at a pre-conversion valuation equal to the sum of (a) the applicable Valuation Amount with respect to the Notes being converted plus (b) the aggregate Roll-Up Value for any Roll-Up Interests purchased by the Company on or prior to the date of such conversion. "**Change of Control**" means (i) the acquisition of all or substantially all of the assets, or all or substantially all of the securities, of the Company by any person, other than a wholly-owned subsidiary of the Company, and excluding a

DocuSign Envelope ID: BD365195-BB70-41BA-B693-37185D923879

FILED DATE: 12/11/2020 2:41 PM   2020L013307

transaction involving an exchange of equity interest in which members of the Company prior to the transaction will own, by virtue of their pre-acquisition equity interest (or equity interest received in consideration thereof), a majority of the voting power of the entity surviving the transaction (or the company which following such transaction is the parent company, if applicable), (ii) the merger or consolidation of the Company by, with or into other person, other than a wholly-owned subsidiary of the Company, and excluding a transaction in which members prior to the transaction will own, by virtue of their pre-acquisition equity interest (or equity interest received in consideration thereof), a majority of the voting power of the entity surviving the transaction (or the company which following such transaction is the parent company, as applicable), or (iii) the Company's first underwritten public offering of shares of common stock pursuant to an effective registration statement under the Securities Act of 1933, as amended.

In all events of conversion of Notes and as a condition thereto, which only the Company can waive, Holders agree to execute all documents executed by shareholders or members of the Company holding similar equity to which the Note is converted, and Holders hereby irrevocably appoint the Company and its designated officers to execute such documents on behalf of the Holders.

5.    <u>Permitted Prepayment</u>. Company shall not have the right to prepay all or any portion of the Note at any time before the Maturity Date except as provided in this Section 5. Company may prepay any portion up to the entire principal balance of the Note, together with all accrued and unpaid interest thereon to the date of prepayment, provided that the Holder shall thereafter have a right to purchase the most senior equity securities of the Company based on the then current valuation of the Company, as determined in good faith by the Company, provided, however, that the valuation of the Company for such purpose shall not exceed the sum of (i) the applicable Valuation Amount with respect to the Notes originally issued to such Holder plus (ii) the aggregate Roll-Up Value for any Roll-Up Interests purchased by the Company on or prior to the date of such purchase; provided, however, that the Holder shall only be entitled to the rights in this Section 5 if the Holder exercises such rights before the Maturity Date.

6.    <u>Representations and Warranties of the Company</u>. The Company hereby represents and warrants to the Investors as follows:

6.1    <u>Organization</u>. The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware; and has all requisite company power and authority to own and lease its property and to carry on its business as presently conducted and as proposed to be conducted.

6.2    <u>Capitalization</u>. The Company has issued membership units to five Members, which Members collectively hold a 100% percent equity interest in the Company as of the date hereof.

6.3    <u>Authorization of this Agreement and the Notes</u>. The execution, delivery and performance by the Company of this Agreement and the Notes and of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of the Company. This Agreement has been duly executed and delivered by the Company and constitutes a valid and binding agreement of the Company that is enforceable in accordance with its terms. As of the date of issue thereof, each of the Notes will constitute a valid and binding obligation of the Company that is enforceable in accordance with its terms. The execution, delivery and performance of this Agreement and the Notes, and the compliance with the provisions hereof and thereof by the Company, will not (i) conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute (with due notice or lapse of time, or both) a default (or give rise to any right of termination, cancellation or acceleration) under (A) any agreement, document, instrument, contract, understanding, arrangement, note, indenture, mortgage or lease to which the Company is a party or under which the Company or any of its assets is

DocuSign Envelope ID: BD365195-BB70-41BA-B693-37185D923879

FILED DATE: 12/11/2020 2:41 PM    2020L013307

bound or affected, (B) the Company's Articles of Organization, or (C) the Company's Operating Agreement; or (ii) result in the creation of any lien, security interest, charge or encumbrance upon any of the properties or assets of the Company.

6.4    <u>Consents and Approvals</u>. No authorization, consent, approval or other order of, or declaration to or filing with, any governmental agency or body (other than filings required to be made under applicable federal or state securities laws) is required for the valid authorization, execution, delivery and performance by the Company of this Agreement or the Notes. The Company has obtained all other consents that are necessary to permit the consummation of the transactions contemplated hereby.

6.5    <u>Brokers</u>. No person or entity has or will have, as a result of the transactions contemplated by this Agreement, any right, interest or claim against or upon the Company or the Investors for any commission, fee or other compensation as a finder or broker because of any act or omission by the Company or by any agent of the Company.

6.6    <u>Sole Representations</u>. Except as expressly set forth in this **Section 6**, the Company makes no other representation or warranty in connection with the transactions contemplated by this Agreement.

7.    <u>Representations and Warranties of the Investors</u>. Each of the Investors, severally and not jointly, represents and warrants to the Company as follows:

7.1    <u>Authorization</u>.  The Investor has full power and authority to enter into this Agreement which, when executed and delivered by the Investor, will constitute the valid and legally binding obligation of the Investor, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

7.2    <u>Purchase for Investment</u>. The Investor is purchasing the Note, and if and when the Note is converted will acquire equity interest in the Company, for investment for the account of the Investor and not for the account of any other person, and not with a view toward resale or other distribution thereof. The Investor understands that the Note being purchased has not been, and when issued the equity interest issuable upon conversion will not be, registered under the Securities Act of 1933, as mended (the "**Securities Act**") and applicable state securities laws and, therefore, cannot be resold unless subsequently registered under the Securities Act and applicable state securities laws or unless an exemption from such registration is available. The Investor further understands and agrees that, until so registered or transferred pursuant to the provisions of Rule 144 under the Securities Act, the Note and all certificates evidencing any of the equity interest, whether upon initial issuance or upon any transfer thereof, shall bear a legend, prominently stamped or printed thereon, reading substantially as follows:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>**ACT**</u>"), OR APPLICABLE STATE SECURITIES LAWS.  THIS SECURITY MAY ONLY BE SOLD, PLEDGED, OR OTHERWISE TRANSFERRED PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS, OR PURSUANT TO AN EXEMPTION FROM THE REGISTRATION PROVISIONS OF THE ACT AND SUCH LAWS.  ADDITIONAL CONDITIONS ARE IMPOSED BY THIS SECURITY AND THE AGREEMENT PURSUANT TO WHICH THIS

FILED DATE: 12/11/2020 2:41 PM    2020L013307

SECURITY WAS SOLD, AND THE COMPANY MAY REFUSE TO THE
TRANSFER OF THIS SECURITY UNLESS SUCH CONDITIONS ARE FULFILLED.

The Investor understands and agrees that the Company does not have any present intention and is under no obligation to register the Note, the equity interest issuable upon conversion, whether upon initial issuance or upon any transfer thereof under the Securities Act and applicable state securities laws, and that Rule 144 may not be available as a basis for exemption from registration. The Investor acknowledges and agrees that the Company may condition the transfer of the Note, or the equity interest, upon the receipt of an opinion, satisfactory in form and substance to the Company and from counsel satisfactory to the Company, in each of such instances in the sole discretion of the Company, that such proposed transfer shall not result in the violation of any federal or state securities law.

7.3     Receipt of Information. The Investor or such Investor's representative, during the course of this transaction and prior to the purchase of the Note being purchased by the Investor hereunder, has had the opportunity to ask questions of and receive answers from representatives of the Company concerning the terms and conditions of the offering of the Notes and the business of the Company; and to obtain any additional information or documents relative to the Company, its business and an investment in the Company necessary to verify the accuracy of information provided by the Company relative to the business of the Company. The Investor or the Investor's representative has received and read or reviewed, and is familiar with, this Agreement, the form of the Note and all such additional information and documents provided to the Investor.

7.4     Sophistication of Investor. The Investor or the Investor's representative is capable of evaluating the merits and risks of the purchase of the Notes. The Investor has the capacity to protect his or her own interests in connection with the purchase of the Notes by reason of the Investor's business or financial experience or the business or financial experience of the Investor's representative (who is unaffiliated with and who is not compensated by the Company or any affiliate, directly or indirectly).

7.5     Risk of Investment. The purchase of a Note by the Investor is consistent with his or her general investment objectives. The Investor understands that the purchase of the Notes involves a high degree of risk and there is now no established market for the Company's Notes or equity interest and there is no assurance that any public market for the Notes or such equity interest will develop. The Investor has no present need for liquidity in connection with the funds being tendered by such Investor hereunder. The Investor can bear the economic risks of this investment and can afford a complete loss of his investment.

7.6     Accredited Investor. The Investor has completed and delivered to the Company herewith the Accredited Investor Questionnaire attached hereto as Form A acknowledging, among other matters, that he, she or it is an "**Accredited Investor**," as that term is defined in Rule 501 of Regulation D promulgated under the Securities Act.

7.7     No Commissions. No person or entity has or will have, as a result of the transactions contemplated by this Agreement, any right, interest or claim against or upon the Company or the Investor for any commission, fee or other compensation as a finder or broker because of any act or omission by the Investor or by any agent of the Investor.

7.8     No General Solicitation. Neither the Investor, nor any of its officers, directors, employees, agents, stockholders or partners has either directly or indirectly, including through a broker or finder (a) engaged in any general solicitation, or (b) published any advertisement in connection with the offer and sale of the Notes.

DocuSign Envelope ID: BD365195-BB70-43BA-B693-37185D923879

FILED DATE: 12/11/2020 2:41 PM   2020L013307

7.9     Residence.  If the Investor is an individual, then the Investor resides in the state or province identified in the address of the Investor set forth on the Signature Page; if the Investor is a partnership, corporation, limited liability company or other entity, then the office or offices of the Investor in which its principal place of business is identified in the address or addresses of the Investor set forth on the Signature Page.

8.   Closing Conditions.

8.1     Conditions to Obligations of the Investors. It shall be a condition precedent to the obligations of any Investor to be performed at the Initial Closing or at the subsequent Closing in which such Investor participates that:

(i)     Investors received all documents which they may reasonably have requested in connection with such transactions.

(ii)     All representations and warranties of the Company shall be accurate, correct and complete on the date hereof.

(iii)     There shall have been no material adverse change in the financial condition of the Company between the date of the Signature Page for such Investor and the date of the Closing in which such Investor shall participate.

8.2     Conditions to Obligations of the Company. It shall be a condition precedent to the obligations of the Company hereunder to be performed at the Initial Closing or at any subsequent Closing that:

(i)     The Company shall have received the check, wire transfer or other funds or consideration described in **Section 3** to be delivered to the Company in consideration of the issuance of the Notes at such closing.

(ii)     All representations and warranties of the Investors shall be accurate, correct and complete on the date of the Closing in which such Investors participate.

(iii)     Notwithstanding anything in this Agreement to the contrary, the Company has absolute discretion as to whether or not to accept an investment from the Investor.

9.   Miscellaneous.

9.1     Successors and Assigns. Except as otherwise expressly provided herein, this Agreement shall bind and inure to the benefit of the Company, the Investors, the respective permitted successors and assigns of the Investors and the permitted successors and assigns of the Company. The Company is authorized to assign this Agreement in the event of sale, merger, consolidation, reorganization, consolidation, share exchange, or like transaction,  involving all or substantially all of its assets or equity, provided the assignee agrees in writing to be bound by the provisions of this Purchase Agreement. The Holder may only assign this Agreement upon the prior written consent of the Company and by surrender thereof at the principal office of the Company, duly endorsed by, or accompanied by a written instrument of transfer duly executed by, the registered Holder of this Agreement or his attorney duly authorized in writing and the Note, as specified therein.

9.2     Notices. All notices, offers, acceptances, requests and other communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered, sent by

DocuSign Envelope ID: BD365105-BB70-4DBA-B693-37185D923870

FILED DATE: 12/11/2020 2:41 PM    2020L013307

confirmed fax transmission, electronic mail, or mailed by certified or registered mail to the Company and the Investors at the addresses set forth in their signature lines. If personally delivered or sent by confirmed fax transmission, or electronic mail, such notice shall be deemed received upon such delivery, if mailed by overnight courier such notice shall be deemed received one (1) day after such mailing, and if mailed by certified or registered mail, such notice shall be deemed received three (3) days after such mailing. Each party is responsible to update its own address in the manner prescribed above.

9.3     <u>Entire Agreement</u>. This Agreement and the other writings referred to herein or delivered pursuant hereto which form a part hereof contain the entire agreement among the parties with respect to the subject matter hereof and supersede all prior and contemporaneous arrangements or understandings, whether written or oral, with respect thereto.

9.4     <u>Changes</u>. The terms and provisions of this Agreement may not be modified or amended, or any of the provisions hereof waived, temporarily or permanently, except pursuant to a writing executed by duly authorized representatives of the Company and the Majority Holders.

9.5     <u>Counterparts</u>. This Agreement may be executed in any number of counterparts all of which together shall constitute one and the same instrument. The execution and delivery to the Company of a Signature Page in the form annexed to this Agreement by any Investor who shall previously have been furnished the final form of this Agreement (other than **Schedule I**) shall constitute the execution and delivery of this Agreement by such Investor. All exhibits, schedules and annexes attached hereto are part of this Agreement and are incorporated herein by reference. Electronic and fax signatures shall be deemed and accepted as originals.

9.6     <u>Severability</u>. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction., and such unenforceable provision shall be interpreted to the fullest extent permitted by law.

9.7     <u>Governing Law</u>. This Agreement and any dispute arising under or related to this shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to its conflict of laws provisions. Any dispute arising under or related to this Agreement shall be brought before a single arbitrator appointed by the American Arbitration Association ("**<u>AAA</u>**") under the auspices and commercial arbitration rules of the AAA to be held in Las Vegas, NV.

9.8     <u>Nouns and Pronouns</u>. Whenever the context may require, the singular form of nouns and pronouns shall include the plural and vice versa. The section headings throughout this Agreement are for convenience and reference only, and the words contained therein shall in no way be held to explain, modify, amplify, or aid in the interpretation, construction or meaning of the provisions of this Agreement.

**[SIGNATURE PAGE FOLLOWS]**

FILED DATE: 12/11/2020 2:41 PM   2020L013307

## COUNTERPART SIGNATURE PAGE
## TO
## CONVERTIBLE NOTE PURCHASE AGREEMENT

IN WITNESS WHEREOF, the Company and the Investors have executed this Agreement as of the date first above written.

THE CALYX PG HOLDINGS, LLC                                   Investors

DocuSigned by:

_Howard Keum_

_____
9689D98Z6Z36425...

Name: Howard Keum                                            See Attached Signature Pages
Title:   Manager
Address:  c/o The Calyx PG Holdings, LLC
          2251 N. Rampart Blvd, #370
          Las Vegas, NV 89128

FILED DATE: 12/11/2020 2:41 PM    2020L013307

## COUNTERPART SIGNATURE PAGE
## TO
## CONVERTIBLE NOTE PURCHASE AGREEMENT

By execution of this Signature Page, the undersigned Investor irrevocably agrees that, upon the acceptance of the Company, the Investor shall become a party to and be bound by the provisions of the Convertible Note Purchase Agreement (the "**Purchase Agreement**") to which this Signature Page is appended, a counterpart of which has been furnished to the undersigned. Upon acceptance by the Company, the undersigned hereby authorizes the Company to append this Signature Page to a counterpart of the Purchase Agreement as evidence thereof. The undersigned hereby subscribes for the purchase of a Note (as defined in the Purchase Agreement) in the original principal amount specified below.

**INVESTOR:**

_____
(Signature)

Justin Funk
_____
(Printed Name)

2042 Balmoral Ave
_____
(Street Address of Residence)

Glenview, IL  60025
_____
(City or Town)  (State)  (Zip Code)

847-867-2574
_____
(Telephone Number)

_____
(Facsimile Telephone Number)

_____
(Email Address)

*Each Investor must include the Original Principal Amount of Note Subscribed For below:*

200,000
$ _____

**Accepted:**
**THE CALYX PG HOLDINGS, LLC**

By: _____
Name: Howard Keum, Manager
    10/21/2018 6:06:19 PM PDT
    Date: _____

FILED DATE: 12/11/2020 2:41 PM     2020L013307

# FORM A
## ACCREDITED INVESTOR QUESTIONNAIRE

<u>Accredited Investor Status.</u>  To comply with Federal or state securities laws applicable to this Offering, the Company may need, and therefore asks you to provide, certain information.  Please check all the lines below that apply to indicate whether you fit within any of the following definitions of an "accredited investor":

__X__ Any natural person whose net worth, or joint net worth, with that person's spouse, excluding the value of the primary residence of such natural person, at the time of his or her purchase, exceeds $1,000,000.00. For purposes of this item, "net worth" means the excess of total assets at fair market value (including personal and real property, but excluding the estimated fair market value of a person's primary home) over total liabilities. Total liabilities excludes any mortgage on the primary home in an amount of up to the home's estimated fair market value as long as the mortgage was incurred more than 60 days before the Securities are purchased, but includes (i) any mortgage amount in excess of the home's fair market value and (ii) any mortgage amount that was borrowed during the 60-day period before the closing date for the sale of Securities for the purpose of investing in the Securities.

_____ A natural person who had an individual income in excess of US $200,000 in each of the two most recent years or joint income with that person's spouse in excess of US $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year.

_____ An organization described in Section 501(c)(3) of the Internal Revenue Code, a corporation, a Massachusetts or similar business trust or a partnership, in each case, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of US $5,000,000.

_____ A director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer.

_____ a trust with total assets in excess of US $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of the Securities Act of 1933;

_____ An entity in which all of the equity owners are accredited investors.

_____ A private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

_____ A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

_____ An investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act.

_____ A bank as defined in Section 3(a)(2) or a savings and loan association or other institution defined in Section 3(a)(5)(A) of the Securities Act of 1933 acting in either an individual or fiduciary capacity.

_____ An insurance company as defined in Section 2(13) of the Securities Act of 1933.

_____ Any self-directed employee benefit plan if the investment decisions are made solely by accredited investors.

_____ An employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 whose investment decision is made by a fiduciary which is either a bank, savings and loan association, insurance company, or registered investment advisor, or whose total assets exceed US $5,000,000, or, if a self-directed plan, a plan whose investment decisions are made solely by persons who are accredited investors.

_____ Any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

_____ Any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of US $5,000,000.

_____ None of the above.

DocuSigned by:

_____
Signature of Subscriber or Duly Authorized
Representative          10/22/2018 12:24:12 PM PDT
Dated this ___ day of _____, _____

DocuSign Envelope ID: BD365195-BB70-41BA-B693-37185D923879

FILED DATE: 12/11/2020 2:41 PM   2020L013307

# THE CALYX PG HOLDINGS, LLC

## CONVERTIBLE NOTE PURCHASE AGREEMENT

### SCHEDULE I

(To be completed by the Company)

| Name and Address of Investor | Principal Amount of Note Purchased |
|---|---|

[On file with Company]

### SCHEDULE II

**Roll-Up Interests**

| Entity Name | Equity Interest/Assets Purchased | Roll-Up Value |
|---|---|---|
| CPOG 2017 LLC | 97.0588% equity interest on fully-diluted basis | $12,100,000[1] |
| CPC-Cravens Corp. | 100% equity interest on fully-diluted basis | $19,500,000[1] |
| Navesink Cravens LLC | 100% equity interest on fully-diluted basis | $19,500,000[1] |
| Josh D Brands (seller entity name to be determined) | All intellectual property, including the trademarks for Josh D Brands and relating licensing rights | $6,000,000 |

(1)   The values set forth in this Schedule II relating to equity interests represent the value attributed to the percentage interest listed herein and not to the entire entity.  In the event that the Company purchases a lesser percentage interest, the Roll-Up Value will be reduced proportionally.

DocuSign Envelope ID: BD365195-BB70-41BA-B693-37185D923879

FILED DATE: 12/11/2020 2:41 PM    2020L013307

## SCHEDULE III

### Valuation Amounts

| Notes[1] | Valuation Amount |
|---|---|
| The first $5,000,000 in original principal amount of Notes | $84,000,000 |
| The second $5,000,000 in original principal amount of Notes | $98,000,000 |
| The second $5,000,000 in original principal amount of Notes | $112,000,000 |

(1)    The order of the Notes shall be determined based on the dates when the Company receives the full purchase price amounts from each Holder with respect to the Note(s) to be purchased by such Holder.  To the extent a Note falls into two different categories, the Valuation Amount shall be adjusted *pro rata* (for example, if the Company has issued $4,500,000 of Notes and thereafter issues a subsequent Note for $1,000,000, the Valuation Amount for that subsequent note would be $91,000,000).

DocuSign Envelope ID: BD365195-BB70-4EB9-BE93-97185D923879

**<u>EXHIBIT A</u>**

<u>Form of Convertible Note</u>

[Attached]

DocuSign Envelope ID: BD365105-BB70-4BBA-B691-37185D923879

FILED DATE: 12/11/2020 2:41 PM    2020L013307

THIS NOTE AND THE SECURITIES ISSUABLE UPON CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY APPLICABLE STATE SECURITIES LAWS. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THE SECURITIES UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED OR UNLESS SOLD PURSUANT TO RULE 144 OF SUCH ACT AND APPLICABLE STATE SECURITIES LAWS.

## THE CALYX PG HOLDINGS, LLC

### CONVERTIBLE PROMISSORY NOTE

200,000

10/22/2018 12:24:12 PM PDT

$[_____].00

Las Vegas, Nevada
July [_], 2018

The Calyx PG Holdings, LLC, a Delaware limited liability company (the "**Company**"), with a principal office located at 2251 N. Rampart Blvd, #370, Las Vegas, NV 89128, for value received, hereby promises to pay to [ Justin Funk ], with an address at [2042 Balmoral Ave., Glenview, IL 60025 ], or its registered assigns (the "**Holder**"), the principal amount of [ two hundred thousand ] ($[ 200,000 ]) (such amount, or such portion thereof which remains outstanding from time to time hereunder subsequently referred to as the "**Principal Amount**"), together with single interest accruing at the rate of ten percent (10%) per annum.

This Note is one of a series of convertible notes (the "**Notes**") issued pursuant to that certain Convertible Note Purchase Agreement, dated as of [Date] 10/22/2018 12:24:12 PM PDT (the "**Agreement**"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement. All the Notes are *pari passu* such that all Notes rank equally and no payments shall be made under this Note unless a pro rata payment is simultaneously made under all other Notes.

The following is a statement of the rights of the Holder of this Note and the conditions to which this Note is subject, and to which the Holder, by the acceptance of this Note, agrees:

1.      Maturity Date.  Subject to **Section 2** hereof, a single payment of the then outstanding Principal Amount, plus accrued interest thereon determined in accordance with the first paragraph of this Note, shall be due twenty-four (24) months from the date of this Note (the "**Maturity Date**").

1.1     Default.  Any of the following events shall constitute an "**Event of Default**", unless waived by holders of a majority of the aggregate principal amount outstanding on all Notes (the "**Majority Holders**"):  (a) the Company's execution of a general assignment for the benefit of creditors; (b) the filing by or against the Company of a petition in bankruptcy or any petition for relief under the federal bankruptcy act or the continuation of such petition without dismissal for a period of ninety (90) days or more; or (c) the appointment of a receiver or trustee to take possession of substantially all of the property or assets of the Company.

1.2     Remedies Upon Default.  Following an Event of Default:

(a)      The Holder shall have (i) all rights and remedies granted to it under this Note and the Agreement.  All such rights and remedies and the exercise thereof shall be cumulative.  No exercise of any such rights and remedies shall be deemed to be exclusive or constitute an election of remedies.

FILED DATE: 12/11/2020 2:41 PM    2020L013307

(b)    Payment of the outstanding Principal Amount, together with all accrued and unpaid interest thereon determined in accordance with the first paragraph of this Note shall, at the option of the Majority Holders, become immediately due and payable without notice or demand.

No Event of Default may be waived or shall be deemed to have been waived except by an express notice delivered by the Majority Holders to the Company in accordance with **Section 9**, and any such waiver shall be applicable only to the specific Event(s) of Default expressly identified in such notice and shall not be deemed to apply to any other or subsequent Event of Default.  The Majority Holders may grant or withhold any such waiver in the sole exercise of their discretion, and may condition such waiver upon the payment by the Company of a premium or the acceptance of other terms and conditions under this Note or the Agreement.  No course of dealing by the Holder or the failure, forbearance or delay by the Majority Holders in exercising any of their rights or remedies under this Note or the Agreement shall operate as a waiver of any Event of Default or of any right of the Holder hereunder.

2.    Conversion.  This Note and any amounts due hereunder will be convertible into equity interests of the Company in accordance with the terms of **Section 4** of the Agreement.  Upon conversion of this Note, the Company will be forever released from all of its obligations and liabilities under this Note with regard to that portion of the Principal Amount and accrued interest being converted including, without limitation, the obligation to pay such portion of the Principal Amount and accrued interest.

3.    Treatment of Note.  To the extent permitted by generally accepted accounting principles, the Company will treat, account and report this Note as debt and not equity for accounting purposes and with respect to any returns filed with federal, state or local tax authorities.

4.    Prepayment.   The Company shall not have the right to prepay all or a portion of this Note at any time before the Maturity Date except as provided in **Section 5** of the Agreement.

5.    Security.   This Note is a general unsecured obligation of the Company.

6.    Priority.   This Note is subordinated in right of payment to all current and future indebtedness of the Company for borrowed money (whether or not such indebtedness is secured) to banks, commercial finance lenders or other institutions regularly engaged in the business of lending money (the "**Senior Debt**"). The Company hereby agrees, and by accepting this Note, the Holder hereby acknowledges and agrees, that so long as any Senior Debt is outstanding, upon notice from the holders of such Senior Debt (the "**Senior Creditors**") to the Company that an event of default, or any event which the giving of notice or the passage of time or both would constitute an event of default, has occurred under the terms of the Senior Debt (a "**Default Notice**"), the Company will not make, and the Holder will not receive or retain, any payment under this Note. Nothing in this paragraph will preclude or prohibit the Holder from receiving and retaining any payment hereunder unless and until the Holder has received a Default Notice (which will be effective until waived in writing by the Senior Creditors) or from converting this Note or any amounts due hereunder into equity securities of the Company.

7.     No Stockholder Rights.  Nothing contained in this Note shall be construed as conferring upon the Holder the right to vote or to consent or to receive notice as a stockholder or member in respect of meeting of stockholders or members for the election of directors of the Company or any other matters or any rights whatsoever as a stockholder of the Company; and no dividends shall be payable or accrued in respect of this Note or the interest represented hereby or the securities obtainable hereunder upon conversion until, and only to the extent that, this Note shall have been so converted in accordance with the terms hereof.

8.     Recourse.  The Holder agrees that no officers, directors, managers, members or stockholders of the Company shall have any personal liability with respect to the obligations of the Company under this Note or any agreements related to this Note.

9.     Notice.  Any notice, request or other communication required or permitted hereunder shall be in writing and shall be delivered in accordance with **Section 9.2** of the Agreement.

10.    Waiver and Amendment.  Any provision of this Note may be amended, waived or modified only in accordance with **Section 9.4** of the Agreement.

11.    Restrictions on Transfer of this Note.  No transfers of the Note, or the securities it is convertible into, or any portion hereof or thereof, may be made by the Holder without the prior written consent of the Company, which consent may be withheld in the Company's sole discretion. The rights and obligations of the Company and the Holder shall be binding upon and benefit their respective successors, permitted assigns, heirs, administrators and permitted transferees.

12.    Payment.  Any cash payments of the Principal Amount will be made by check or wire transfer in immediately available United States funds sent to the Holder at the address or to the account furnished to the Company for that purpose.

13.    Governing Law; Jurisdiction.  The provisions of **Section 9.7** of the Agreement shall apply to this Note.

14.    Headings; References.  All headings used herein are used for convenience only and shall not be used to construe or interpret this Note.  Except where otherwise indicated, all references herein to Sections refer to Sections hereof.  All words used in this Note will be construed to be of such gender or number as the circumstances require.

15.     Usury.  This Note is hereby expressly limited so that in no event whatsoever shall the amount paid or agreed to be paid to the Holder hereunder exceed that permissible under applicable law.  If at any time the performance of any provision of this Note involves a payment exceeding the limit that may be validly charged under applicable law then the obligation to be performed shall be automatically reduced to such limit.

*[Signature Page to Follow]*

3

FILED DATE: 12/11/2020 2:41 PM    2020L013307

**IN WITNESS WHEREOF**, the Company has executed this Note as an instrument under seal as of the date and year first written above.

THE CALYX PG HOLDINGS, LLC

By: _____

DocuSigned by:

*Howard Keum*

9689D9826236425...

Name: Howard Keum

Title: Manager

4843-4194-9037.1

4

FILED DATE: 12/11/2020 2:41 PM    2020L013307

**Account Number:**        108815298        Calyx PG Holdings
                                            2251 N. Rampart Blvd, #370
**Routing Number:**        322271627        Las Vegas, NV 89128

                                            Howard Keum 917-657-6011

**If you cannot see your Routing or Account number on your device, please open this PDF using Adobe Reader (select "Open-in" or "more..." above.)**

Si no puedes ver tu  número de Cuenta o de Tránsito interbancario en tu dispositivo, por favor, abre este PDF usando Adobe Reader (selecciona "Abrir en" o "más..." arriba.)

**For your security, we recommend you close this browser window.**

Para tu seguridad, te recomendamos que cierres esta ventana del navegador.

DocuSign Envelope ID: F8603FCD-0A47-4505-8431-5E9F264D7321

FILED DATE: 12/11/2020 2:41 PM   2020L013307

THIS NOTE AND THE SECURITIES ISSUABLE UPON CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY APPLICABLE STATE SECURITIES LAWS.  THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THE SECURITIES UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED OR UNLESS SOLD PURSUANT TO RULE 144 OF SUCH ACT AND APPLICABLE STATE SECURITIES LAWS.

## THE CALYX PG HOLDINGS, LLC

### CONVERTIBLE PROMISSORY NOTE

200,000

$[_____].00

10/15/2018 8:56:00 AM PDT

Las Vegas, Nevada
July [_], 2018

The Calyx PG Holdings, LLC, a Delaware limited liability company (the "**Company**"), with a principal office located at 2251 N. Rampart Blvd, #370, Las Vegas, NV 89128, for value received, hereby promises to pay to [ Craig Funk ], with an address at [ 1386 RFD Long Grove, Il 60047 ], or its registered assigns (the "**Holder**"), the principal amount of [ two hundred thousand ] ($[ 200,000 ]) (such amount, or such portion thereof which remains outstanding from time to time hereunder subsequently referred to as the "**Principal Amount**"), together with single interest accruing at the rate of ten percent (10%) per annum.

This Note is one of a series of convertible notes (the "**Notes**") issued pursuant to that certain Convertible Note Purchase Agreement, dated as of [Date] 10/15/2018 8:56:00 AM PDT (the "**Agreement**"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement. All the Notes are *pari passu* such that all Notes rank equally and no payments shall be made under this Note unless a pro rata payment is simultaneously made under all other Notes.

The following is a statement of the rights of the Holder of this Note and the conditions to which this Note is subject, and to which the Holder, by the acceptance of this Note, agrees:

1.     Maturity Date.  Subject to **Section 2** hereof, a single payment of the then outstanding Principal Amount, plus accrued interest thereon determined in accordance with the first paragraph of this Note, shall be due twenty-four (24) months from the date of this Note (the "**Maturity Date**").

1.1     Default.  Any of the following events shall constitute an "**Event of Default**", unless waived by holders of a majority of the aggregate principal amount outstanding on all Notes (the "**Majority Holders**"):  (a) the Company's execution of a general assignment for the benefit of creditors; (b) the filing by or against the Company of a petition in bankruptcy or any petition for relief under the federal bankruptcy act or the continuation of such petition without dismissal for a period of ninety (90) days or more; or (c) the appointment of a receiver or trustee to take possession of substantially all of the property or assets of the Company.

1.2     Remedies Upon Default.  Following an Event of Default:

(a)     The Holder shall have (i) all rights and remedies granted to it under this Note and the Agreement.  All such rights and remedies and the exercise thereof shall be cumulative.  No exercise of any such rights and remedies shall be deemed to be exclusive or constitute an election of remedies.

**EXHIBIT B**

DocuSign Envelope ID: F8603FCD-0A47-45C5-8431-5E9F264D7321

FILED DATE: 12/11/2020 2:41 PM    2020L013307

(b)    Payment of the outstanding Principal Amount, together with all accrued and unpaid interest thereon determined in accordance with the first paragraph of this Note shall, at the option of the Majority Holders, become immediately due and payable without notice or demand.

No Event of Default may be waived or shall be deemed to have been waived except by an express notice delivered by the Majority Holders to the Company in accordance with **Section 9**, and any such waiver shall be applicable only to the specific Event(s) of Default expressly identified in such notice and shall not be deemed to apply to any other or subsequent Event of Default. The Majority Holders may grant or withhold any such waiver in the sole exercise of their discretion, and may condition such waiver upon the payment by the Company of a premium or the acceptance of other terms and conditions under this Note or the Agreement. No course of dealing by the Holder or the failure, forbearance or delay by the Majority Holders in exercising any of their rights or remedies under this Note or the Agreement shall operate as a waiver of any Event of Default or of any right of the Holder hereunder.

2.    Conversion.  This Note and any amounts due hereunder will be convertible into equity interests of the Company in accordance with the terms of **Section 4** of the Agreement. Upon conversion of this Note, the Company will be forever released from all of its obligations and liabilities under this Note with regard to that portion of the Principal Amount and accrued interest being converted including, without limitation, the obligation to pay such portion of the Principal Amount and accrued interest.

3.    Treatment of Note.  To the extent permitted by generally accepted accounting principles, the Company will treat, account and report this Note as debt and not equity for accounting purposes and with respect to any returns filed with federal, state or local tax authorities.

4.    Prepayment.   The Company shall not have the right to prepay all or a portion of this Note at any time before the Maturity Date except as provided in **Section 5** of the Agreement.

5.    Security.   This Note is a general unsecured obligation of the Company.

6.    Priority.   This Note is subordinated in right of payment to all current and future indebtedness of the Company for borrowed money (whether or not such indebtedness is secured) to banks, commercial finance lenders or other institutions regularly engaged in the business of lending money (the "**Senior Debt**"). The Company hereby agrees, and by accepting this Note, the Holder hereby acknowledges and agrees, that so long as any Senior Debt is outstanding, upon notice from the holders of such Senior Debt (the "**Senior Creditors**") to the Company that an event of default, or any event which the giving of notice or the passage of time or both would constitute an event of default, has occurred under the terms of the Senior Debt (a "**Default Notice**"), the Company will not make, and the Holder will not receive or retain, any payment under this Note. Nothing in this paragraph will preclude or prohibit the Holder from receiving and retaining any payment hereunder unless and until the Holder has received a Default Notice (which will be effective until waived in writing by the Senior Creditors) or from converting this Note or any amounts due hereunder into equity securities of the Company.

2

DocuSign Envelope ID: F8603FCD-0A47-4E05-B431-5E9F264D7321

FILED DATE: 12/11/2020 2:41 PM    2020L013307

7. <u>No Stockholder Rights</u>. Nothing contained in this Note shall be construed as conferring upon the Holder the right to vote or to consent or to receive notice as a stockholder or member in respect of meeting of stockholders or members for the election of directors of the Company or any other matters or any rights whatsoever as a stockholder of the Company; and no dividends shall be payable or accrued in respect of this Note or the interest represented hereby or the securities obtainable hereunder upon conversion until, and only to the extent that, this Note shall have been so converted in accordance with the terms hereof.

8. <u>Recourse</u>. The Holder agrees that no officers, directors, managers, members or stockholders of the Company shall have any personal liability with respect to the obligations of the Company under this Note or any agreements related to this Note.

9. <u>Notice</u>. Any notice, request or other communication required or permitted hereunder shall be in writing and shall be delivered in accordance with **Section 9.2** of the Agreement.

10. <u>Waiver and Amendment</u>. Any provision of this Note may be amended, waived or modified only in accordance with **Section 9.4** of the Agreement.

11. <u>Restrictions on Transfer of this Note</u>. No transfers of the Note, or the securities it is convertible into, or any portion hereof or thereof, may be made by the Holder without the prior written consent of the Company, which consent may be withheld in the Company's sole discretion. The rights and obligations of the Company and the Holder shall be binding upon and benefit their respective successors, permitted assigns, heirs, administrators and permitted transferees.

12. <u>Payment</u>. Any cash payments of the Principal Amount will be made by check or wire transfer in immediately available United States funds sent to the Holder at the address or to the account furnished to the Company for that purpose.

13. <u>Governing Law; Jurisdiction</u>. The provisions of **Section 9.7** of the Agreement shall apply to this Note.

14. <u>Headings; References</u>. All headings used herein are used for convenience only and shall not be used to construe or interpret this Note. Except where otherwise indicated, all references herein to Sections refer to Sections hereof. All words used in this Note will be construed to be of such gender or number as the circumstances require.

15. <u>Usury</u>. This Note is hereby expressly limited so that in no event whatsoever shall the amount paid or agreed to be paid to the Holder hereunder exceed that permissible under applicable law. If at any time the performance of any provision of this Note involves a payment exceeding the limit that may be validly charged under applicable law then the obligation to be performed shall be automatically reduced to such limit.

*[Signature Page to Follow]*

DocuSign Envelope ID: F8603FCD-0A47-45C5-B431-5E9F264D7321

FILED DATE: 12/11/2020 2:41 PM   2020L013307

   **IN WITNESS WHEREOF**, the Company has executed this Note as an instrument under seal as of the date and year first written above.

        **THE CALYX PG HOLDINGS, LLC**

      By: _____

         Name: Howard Keum

         Title: Manager

4843-4194-9037.1

DocuSign Envelope ID: F8603FCD-0A47-45C5-8431-5E9F264D7321

Craig Funk

## THE CALYX PG HOLDINGS, LLC

### CONVERTIBLE NOTE PURCHASE AGREEMENT

10/15/2018 8:56:00 AM PDT

CONVERTIBLE NOTE PURCHASE AGREEMENT, dated as of [Date]_____ (this "**Agreement**"), is entered into by The Calyx PG Holdings, LLC, a Delaware limited liability company with offices located at 2251 N. Rampart Blvd, #370, Las Vegas, NV 89128 (the "**Company**") and the persons listed on **Schedule I** attached hereto (the "**Investors**").

PRELIMINARY STATEMENT

The Company is conducting a round of financing, raising up to $15,000,000 in the form of unsecured convertible promissory notes (each individually a "**Note**" and collectively, the "**Notes**", with each registered owner of a Note being sometimes referred to as a "**Holder**") that can be convertible into equity in the Company as more specifically set forth herein.

TERMS AND CONDITIONS

NOW, THEREFORE, in consideration of their mutual covenants set forth herein, the Company and the Investors agree as follows:

1.  Authorization of Notes. Prior to the Initial Closing (as defined in **Section 3.1**), the Company shall have authorized the issuance and sale of Notes of not more than Fifteen Million Dollars ($15,000,000) in original principal amount. The Notes shall be convertible into equity in the Company, all as set forth, and subject to the provisions of, the form of Convertible Note attached as **Exhibit A** and incorporated herein.

2.  Sale and Issuance of Notes. At the Initial Closing, and thereafter at one or more subsequent Closings, the Company shall sell and issue to each Investor, and each Investor shall purchase and acquire from the Company, upon the terms and conditions set forth herein, a Note in the original principal amount as set forth on the Signature Page (defined below) of such Investor attached hereto (which amount shall thereafter be entered by the Company on **Schedule I** opposite such Investor's name) at a purchase price equal to such original principal amount. Each Investor's obligations hereunder with respect to the purchase of a Note as set forth herein shall be several, and not joint.

3.  Closing of Sale of Notes.

    3.1    Closings. The closings with respect to the transactions contemplated hereby (each a "**Closing**") shall take place on such one or more dates (each a "**Closing Date**") as may be determined by the Company either (i) until the Company shall have effectuated Closings for not more than $15,000,000 in original principal amount of the Notes, or (ii) until the Company shall have determined, in its sole discretion, that the offering of the Notes made by this Agreement shall have terminated. The Initial Closing shall take place on the date hereof or such date when the Company shall have subscribed for Closings of not less than $5,000,000 in original principal amount (the "**Initial Closing**"). Each Closing shall be held at the offices of the Company or remotely via the exchange of documents and signatures. Each Investor who desires to purchase a Note hereunder shall subscribe thereto by completing, executing and delivering to the Company the signature page attached to this Agreement (each a "**Signature Page**") and the Accredited Investor Questionnaire attached hereto as **Form A**, together with payment by check drawn on good funds or by wire transfer of immediately available funds of the original principal amount of the Note so purchased. As each Closing is completed, the Signature Pages of Investors purchasing Notes at such Closing shall be attached to this Agreement, and **Schedule I**

- 1 -

FILED DATE: 12/11/2020 2:41 PM    2020L013307

DocuSign Envelope ID: F8603FCD-0A47-45D5-B431-5E9F264D7321

shall be amended accordingly. The Company may accept or reject, in whole or in part and at its sole discretion, any offer by an Investor to purchase a Note.

        3.2    Issuance and Delivery of Note. As of the date of each Closing, the Company shall issue and deliver to each Investor an executed Note in the form of **Exhibit A** in the original principal amount as is set forth on the Signature Page of such Investor delivered to the Company hereunder (which amount shall thereafter be entered by the Company on Schedule I opposite such Investor's name). The rights of each Investor with respect to such Investor's Note shall be as set forth in the Note and this Agreement.

        4.    Conversion of Notes. In accordance with the terms and conditions set forth in the Notes, the entire amount of outstanding principal and accrued interest under each Note shall be convertible in the event of the closing of a Qualified Offering, as follows:

        4.1    Mandatory Conversion. In the event that the Company completes an offering of equity interests of the Company resulting in aggregate gross proceeds to the Company of at least $10,000,000 (excluding conversion of the Notes or other convertible notes) (a "**Qualified Offering**") prior to the Maturity Date (as defined in the Notes), all Notes shall automatically and simultaneously with the closing thereof be converted (which such conversion shall be mandatory as to all Notes outstanding at the time of such Qualified Offering) into units of equity of the Company issued to purchasers in such Qualified Offering, at a price per unit equal to the per unit price paid by purchasers for such units less a discount of twenty percent (20%), and otherwise on the same economic terms and conditions applicable to the units of equity interest purchased by purchasers in such Qualified Offering, provided, however, that as further protection to the Holders, upon a Qualified Offering, the valuation of the Company shall not exceed the sum of (i) $140,000,000 pre-money valuation plus (ii) to the extent the Company has purchased any equity interests in or, as applicable, the assets of the companies set forth on **Schedule II** attached hereto (the "**Roll-Up Interests**"), the value set forth next to each such purchased interest on **Schedule II** (the "**Roll-Up Value**"), for the sole purpose of calculating the amount of equity to which the Notes are converted into to reflect pre-investment dilution expectations and requirements by the Holders.

        4.2    Optional Conversion. If the Company does not consummate a Qualified Offering prior to the Maturity Date, the then outstanding principal amount, together with accrued interest, on the Notes may, at the election of the holders of a majority of the outstanding principal amount on all Notes (the "**Majority Holders**"), be either (i) converted into the most senior equity then issued by the Company, at the then current valuation of the Company, as determined in good faith by the Company, provided, however, that as further protection to the Holders, the valuation of the Company shall not exceed the sum of (a) the applicable amount with respect to the Notes being converted as set forth on **Schedule III** hereto (the "**Valuation Amount**") plus (b) the aggregate Roll-Up Value for any Roll-Up Interests purchased by the Company on or prior to such conversion, for the sole purpose of calculating the amount of equity to which the Notes are converted into or (ii) paid in full within thirty (30) days following receipt by the Company of such election of the Majority Holders.

        4.3    Change of Control. In the event that the Company effects a Change of Control (as defined below) prior to the Maturity Date, then each Holder shall surrender its Note for, at the election of the Majority Holders, either (i) repayment of outstanding principal and interest under the Notes or (ii) the conversion of the Notes into the most senior equity class or series of securities then issued by the Company at a pre-conversion valuation equal to the sum of (a) the applicable Valuation Amount with respect to the Notes being converted plus (b) the aggregate Roll-Up Value for any Roll-Up Interests purchased by the Company on or prior to the date of such conversion. "**Change of Control**" means (i) the acquisition of all or substantially all of the assets, or all or substantially all of the securities, of the Company by any person, other than a wholly-owned subsidiary of the Company, and excluding a

DocuSign Envelope ID: F8603FCD-0A47-45C5-8431-5E9F264D7221

transaction involving an exchange of equity interest in which members of the Company prior to the transaction will own, by virtue of their pre-acquisition equity interest (or equity interest received in consideration thereof), a majority of the voting power of the entity surviving the transaction (or the company which following such transaction is the parent company, if applicable), (ii) the merger or consolidation of the Company by, with or into other person, other than a wholly-owned subsidiary of the Company, and excluding a transaction in which members prior to the transaction will own, by virtue of their pre-acquisition equity interest (or equity interest received in consideration thereof), a majority of the voting power of the entity surviving the transaction (or the company which following such transaction is the parent company, as applicable), or (iii) the Company's first underwritten public offering of shares of common stock pursuant to an effective registration statement under the Securities Act of 1933, as amended.

In all events of conversion of Notes and as a condition thereto, which only the Company can waive, Holders agree to execute all documents executed by shareholders or members of the Company holding similar equity to which the Note is converted, and Holders hereby irrevocably appoint the Company and its designated officers to execute such documents on behalf of the Holders.

5. <u>Permitted Prepayment</u>. Company shall not have the right to prepay all or any portion of the Note at any time before the Maturity Date except as provided in this Section 5. Company may prepay any portion up to the entire principal balance of the Note, together with all accrued and unpaid interest thereon to the date of prepayment, provided that the Holder shall thereafter have a right to purchase the most senior equity securities of the Company based on the then current valuation of the Company, as determined in good faith by the Company, provided, however, that the valuation of the Company for such purpose shall not exceed the sum of (i) the applicable Valuation Amount with respect to the Notes originally issued to such Holder plus (ii) the aggregate Roll-Up Value for any Roll-Up Interests purchased by the Company on or prior to the date of such purchase; provided, however, that the Holder shall only be entitled to the rights in this Section 5 if the Holder exercises such rights before the Maturity Date.

6. <u>Representations and Warranties of the Company</u>. The Company hereby represents and warrants to the Investors as follows:

6.1 <u>Organization</u>. The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware; and has all requisite company power and authority to own and lease its property and to carry on its business as presently conducted and as proposed to be conducted.

6.2 <u>Capitalization</u>. The Company has issued membership units to five Members, which Members collectively hold a 100% percent equity interest in the Company as of the date hereof.

6.3 <u>Authorization of this Agreement and the Notes</u>. The execution, delivery and performance by the Company of this Agreement and the Notes and of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of the Company. This Agreement has been duly executed and delivered by the Company and constitutes a valid and binding agreement of the Company that is enforceable in accordance with its terms. As of the date of issue thereof, each of the Notes will constitute a valid and binding obligation of the Company that is enforceable in accordance with its terms. The execution, delivery and performance of this Agreement and the Notes, and the compliance with the provisions hereof and thereof by the Company, will not (i) conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute (with due notice or lapse of time, or both) a default (or give rise to any right of termination, cancellation or acceleration) under (A) any agreement, document, instrument, contract, understanding, arrangement, note, indenture, mortgage or lease to which the Company is a party or under which the Company or any of its assets is

DocuSign Envelope ID: F8603FCD-9A47-45D3-B431-5E9F264D7321

FILED DATE: 12/11/2020 2:41 PM    2020L013307

bound or affected, (B) the Company's Articles of Organization, or (C) the Company's Operating Agreement; or (ii) result in the creation of any lien, security interest, charge or encumbrance upon any of the properties or assets of the Company.

6.4    <u>Consents and Approvals</u>. No authorization, consent, approval or other order of, or declaration to or filing with, any governmental agency or body (other than filings required to be made under applicable federal or state securities laws) is required for the valid authorization, execution, delivery and performance by the Company of this Agreement or the Notes. The Company has obtained all other consents that are necessary to permit the consummation of the transactions contemplated hereby.

6.5    <u>Brokers</u>. No person or entity has or will have, as a result of the transactions contemplated by this Agreement, any right, interest or claim against or upon the Company or the Investors for any commission, fee or other compensation as a finder or broker because of any act or omission by the Company or by any agent of the Company.

6.6    <u>Sole Representations</u>. Except as expressly set forth in this **Section 6**, the Company makes no other representation or warranty in connection with the transactions contemplated by this Agreement.

7.    <u>Representations and Warranties of the Investors</u>. Each of the Investors, severally and not jointly, represents and warrants to the Company as follows:

7.1    <u>Authorization</u>.  The Investor has full power and authority to enter into this Agreement which, when executed and delivered by the Investor, will constitute the valid and legally binding obligation of the Investor, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

7.2    <u>Purchase for Investment</u>. The Investor is purchasing the Note, and if and when the Note is converted will acquire equity interest in the Company, for investment for the account of the Investor and not for the account of any other person, and not with a view toward resale or other distribution thereof. The Investor understands that the Note being purchased has not been, and when issued the equity interest issuable upon conversion will not be, registered under the Securities Act of 1933, as mended (the "**Securities Act**") and applicable state securities laws and, therefore, cannot be resold unless subsequently registered under the Securities Act and applicable state securities laws or unless an exemption from such registration is available. The Investor further understands and agrees that, until so registered or transferred pursuant to the provisions of Rule 144 under the Securities Act, the Note and all certificates evidencing any of the equity interest, whether upon initial issuance or upon any transfer thereof, shall bear a legend, prominently stamped or printed thereon, reading substantially as follows:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR APPLICABLE STATE SECURITIES LAWS.  THIS SECURITY MAY ONLY BE SOLD, PLEDGED, OR OTHERWISE TRANSFERRED PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS, OR PURSUANT TO AN EXEMPTION FROM THE REGISTRATION PROVISIONS OF THE ACT AND SUCH LAWS.  ADDITIONAL CONDITIONS ARE IMPOSED BY THIS SECURITY AND THE AGREEMENT PURSUANT TO WHICH THIS

DocuSign Envelope ID: E8603FCD-0A47-45C5-B431-5E9F264D7221

FILED DATE: 12/11/2020 2:41 PM    2020L013307

SECURITY WAS SOLD, AND THE COMPANY MAY REFUSE TO THE TRANSFER OF THIS SECURITY UNLESS SUCH CONDITIONS ARE FULFILLED.

The Investor understands and agrees that the Company does not have any present intention and is under no obligation to register the Note, the equity interest issuable upon conversion, whether upon initial issuance or upon any transfer thereof under the Securities Act and applicable state securities laws, and that Rule 144 may not be available as a basis for exemption from registration. The Investor acknowledges and agrees that the Company may condition the transfer of the Note, or the equity interest, upon the receipt of an opinion, satisfactory in form and substance to the Company and from counsel satisfactory to the Company, in each of such instances in the sole discretion of the Company, that such proposed transfer shall not result in the violation of any federal or state securities law.

7.3    Receipt of Information. The Investor or such Investor's representative, during the course of this transaction and prior to the purchase of the Note being purchased by the Investor hereunder, has had the opportunity to ask questions of and receive answers from representatives of the Company concerning the terms and conditions of the offering of the Notes and the business of the Company; and to obtain any additional information or documents relative to the Company, its business and an investment in the Company necessary to verify the accuracy of information provided by the Company relative to the business of the Company. The Investor or the Investor's representative has received and read or reviewed, and is familiar with, this Agreement, the form of the Note and all such additional information and documents provided to the Investor.

7.4    Sophistication of Investor. The Investor or the Investor's representative is capable of evaluating the merits and risks of the purchase of the Notes. The Investor has the capacity to protect his or her own interests in connection with the purchase of the Notes by reason of the Investor's business or financial experience or the business or financial experience of the Investor's representative (who is unaffiliated with and who is not compensated by the Company or any affiliate, directly or indirectly).

7.5    Risk of Investment. The purchase of a Note by the Investor is consistent with his or her general investment objectives. The Investor understands that the purchase of the Notes involves a high degree of risk and there is now no established market for the Company's Notes or equity interest and there is no assurance that any public market for the Notes or such equity interest will develop. The Investor has no present need for liquidity in connection with the funds being tendered by such Investor hereunder. The Investor can bear the economic risks of this investment and can afford a complete loss of his investment.

7.6    Accredited Investor. The Investor has completed and delivered to the Company herewith the Accredited Investor Questionnaire attached hereto as Form A acknowledging, among other matters, that he, she or it is an "**Accredited Investor**," as that term is defined in Rule 501 of Regulation D promulgated under the Securities Act.

7.7    No Commissions. No person or entity has or will have, as a result of the transactions contemplated by this Agreement, any right, interest or claim against or upon the Company or the Investor for any commission, fee or other compensation as a finder or broker because of any act or omission by the Investor or by any agent of the Investor.

7.8    No General Solicitation.  Neither the Investor, nor any of its officers, directors, employees, agents, stockholders or partners has either directly or indirectly, including through a broker or finder (a) engaged in any general solicitation, or (b) published any advertisement in connection with the offer and sale of the Notes.

FILED DATE: 12/11/2020 2:41 PM   2020L013307

7.9 _Residence_. If the Investor is an individual, then the Investor resides in the state or province identified in the address of the Investor set forth on the Signature Page; if the Investor is a partnership, corporation, limited liability company or other entity, then the office or offices of the Investor in which its principal place of business is identified in the address or addresses of the Investor set forth on the Signature Page.

8. _Closing Conditions_.

8.1 _Conditions to Obligations of the Investors_. It shall be a condition precedent to the obligations of any Investor to be performed at the Initial Closing or at the subsequent Closing in which such Investor participates that:

(i) Investors received all documents which they may reasonably have requested in connection with such transactions.

(ii) All representations and warranties of the Company shall be accurate, correct and complete on the date hereof.

(iii) There shall have been no material adverse change in the financial condition of the Company between the date of the Signature Page for such Investor and the date of the Closing in which such Investor shall participate.

8.2 _Conditions to Obligations of the Company_. It shall be a condition precedent to the obligations of the Company hereunder to be performed at the Initial Closing or at any subsequent Closing that:

(i) The Company shall have received the check, wire transfer or other funds or consideration described in **Section 3** to be delivered to the Company in consideration of the issuance of the Notes at such closing.

(ii) All representations and warranties of the Investors shall be accurate, correct and complete on the date of the Closing in which such Investors participate.

(iii) Notwithstanding anything in this Agreement to the contrary, the Company has absolute discretion as to whether or not to accept an investment from the Investor.

9. _Miscellaneous_.

9.1 _Successors and Assigns_. Except as otherwise expressly provided herein, this Agreement shall bind and inure to the benefit of the Company, the Investors, the respective permitted successors and assigns of the Investors and the permitted successors and assigns of the Company. The Company is authorized to assign this Agreement in the event of sale, merger, consolidation, reorganization, consolidation, share exchange, or like transaction, involving all or substantially all of its assets or equity, provided the assignee agrees in writing to be bound by the provisions of this Purchase Agreement. The Holder may only assign this Agreement upon the prior written consent of the Company and by surrender thereof at the principal office of the Company, duly endorsed by, or accompanied by a written instrument of transfer duly executed by, the registered Holder of this Agreement or his attorney duly authorized in writing and the Note, as specified therein.

9.2 _Notices_. All notices, offers, acceptances, requests and other communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered, sent by

FILED DATE: 12/11/2020 2:41 PM    2020L013307

confirmed fax transmission, electronic mail, or mailed by certified or registered mail to the Company and the Investors at the addresses set forth in their signature lines.  If personally delivered or sent by confirmed fax transmission, or electronic mail, such notice shall be deemed received upon such delivery, if mailed by overnight courier such notice shall be deemed received one (1) day after such mailing, and if mailed by certified or registered mail, such notice shall be deemed received three (3) days after such mailing. Each party is responsible to update its own address in the manner prescribed above.

9.3    <u>Entire Agreement</u>. This Agreement and the other writings referred to herein or delivered pursuant hereto which form a part hereof contain the entire agreement among the parties with respect to the subject matter hereof and supersede all prior and contemporaneous arrangements or understandings, whether written or oral, with respect thereto.

9.4    <u>Changes</u>. The terms and provisions of this Agreement may not be modified or amended, or any of the provisions hereof waived, temporarily or permanently, except pursuant to a writing executed by duly authorized representatives of the Company and the Majority Holders.

9.5    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts all of which together shall constitute one and the same instrument. The execution and delivery to the Company of a Signature Page in the form annexed to this Agreement by any Investor who shall previously have been furnished the final form of this Agreement (other than **Schedule I**) shall constitute the execution and delivery of this Agreement by such Investor. All exhibits, schedules and annexes attached hereto are part of this Agreement and are incorporated herein by reference. Electronic and fax signatures shall be deemed and accepted as originals.

9.6    <u>Severability</u>. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction., and such unenforceable provision shall be interpreted to the fullest extent permitted by law.

9.7    <u>Governing Law</u>. This Agreement and any dispute arising under or related to this shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to its conflict of laws provisions. Any dispute arising under or related to this Agreement shall be brought before a single arbitrator appointed by the American Arbitration Association ("**<u>AAA</u>**") under the auspices and commercial arbitration rules of the AAA to be held in Las Vegas, NV.

9.8    <u>Nouns and Pronouns</u>. Whenever the context may require, the singular form of nouns and pronouns shall include the plural and vice versa. The section headings throughout this Agreement are for convenience and reference only, and the words contained therein shall in no way be held to explain, modify, amplify, or aid in the interpretation, construction or meaning of the provisions of this Agreement.

**[SIGNATURE PAGE FOLLOWS]**

FILED DATE: 12/11/2020 2:41 PM    2020L013307

**COUNTERPART SIGNATURE PAGE**
**TO**
**CONVERTIBLE NOTE PURCHASE AGREEMENT**

IN WITNESS WHEREOF, the Company and the Investors have executed this Agreement as of the date first above written.

THE CALYX PG HOLDINGS, LLC                                Investors

_____

Name: Howard Keum                                          See Attached Signature Pages
Title:  Manager
Address:  c/o The Calyx PG Holdings, LLC
              2251 N. Rampart Blvd, #370
              Las Vegas, NV 89128

FILED DATE: 12/11/2020 2:41 PM    2020L013307

## COUNTERPART SIGNATURE PAGE
## TO
## CONVERTIBLE NOTE PURCHASE AGREEMENT

By execution of this Signature Page, the undersigned Investor irrevocably agrees that, upon the acceptance of the Company, the Investor shall become a party to and be bound by the provisions of the Convertible Note Purchase Agreement (the "**Purchase Agreement**") to which this Signature Page is appended, a counterpart of which has been furnished to the undersigned. Upon acceptance by the Company, the undersigned hereby authorizes the Company to append this Signature Page to a counterpart of the Purchase Agreement as evidence thereof. The undersigned hereby subscribes for the purchase of a Note (as defined in the Purchase Agreement) in the original principal amount specified below.

**INVESTOR:**

_____
(Signature)

Craig Funk
_____
(Printed Name)

Craig W Funk
_____
(Street Address of Residence)

1386 RFD
_____
(City or Town) (State) (Zip Code)

Long Grove, IL 60047
_____
(Telephone Number)

_____
(Facsimile Telephone Number)

_____
(Email Address)

*Each Investor must include the Original Principal Amount of Note Subscribed For below:*

200,000

$ _____

**Accepted:**
**THE CALYX PG HOLDINGS, LLC**

By:_____
Name: Howard Keum, Manager
Date: _____
10/14/2018 10:37:39 PM PDT

# FORM A
## ACCREDITED INVESTOR QUESTIONNAIRE

<u>Accredited Investor Status</u>.  To comply with Federal or state securities laws applicable to this Offering, the Company may need, and therefore asks you to provide, certain information.  Please check all the lines below that apply to indicate whether you fit within any of the following definitions of an "accredited investor":

__x__    Any natural person whose net worth, or joint net worth, with that person's spouse, excluding the value of the primary residence of such natural person, at the time of his or her purchase, exceeds $1,000,000.00. For purposes of this item, "net worth" means the excess of total assets at fair market value (including personal and real property), but excluding the estimated fair market value of a person's primary home) over total liabilities. Total liabilities excludes any mortgage on the primary home in an amount of up to the home's estimated fair market value as long as the mortgage was incurred more than 60 days before the Securities are purchased, but includes (i) any mortgage amount in excess of the home's fair market value and (ii) any mortgage amount that was borrowed during the 60-day period before the closing date for the sale of Securities for the purpose of investing in the Securities.

_____    A natural person who had an individual income in excess of US $200,000 in each of the two most recent years or joint income with that person's spouse in excess of US $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year.

_____    An organization described in Section 501(c)(3) of the Internal Revenue Code, a corporation, a Massachusetts or similar business trust or a partnership, in each case, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of US $5,000,000.

_____    A director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer.

_____    a trust with total assets in excess of US $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of the Securities Act of 1933;

_____    An entity in which all of the equity owners are accredited investors.

_____    A private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

_____    A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

_____    An investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act.

_____    A bank as defined in Section 3(a)(2) or a savings and loan association or other institution defined in Section 3(a)(5)(A) of the Securities Act of 1933 acting in either an individual or fiduciary capacity.

_____    An insurance company as defined in Section 2(13) of the Securities Act of 1933.

_____    Any self-directed employee benefit plan if the investment decisions are made solely by accredited investors.

_____    An employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 whose investment decision is made by a fiduciary which is either a bank, savings and loan association, insurance company, or registered investment advisor, or whose total assets exceed US $5,000,000, or, if a self-directed plan, a plan whose investment decisions are made solely by persons who are accredited investors.

_____    Any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

_____    Any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of US $5,000,000.

_____    None of the above.

DocuSigned by:

_Craig W. Denk_

_____

Signature of Subscriber or Duly Authorized
Representative        10/15/2018 8:56:00 AM PDT
Dated this ____ day of _____, _____

FILED DATE: 12/11/2020 2:41 PM  2020L013307

# THE CALYX PG HOLDINGS, LLC

## CONVERTIBLE NOTE PURCHASE AGREEMENT

## <u>SCHEDULE I</u>
(To be completed by the Company)

| <u>Name and Address of Investor</u> | <u>Principal Amount of Note Purchased</u> |
|---|---|
| [On file with Company] | |

## <u>SCHEDULE II</u>

## Roll-Up Interests

| <u>Entity Name</u> | <u>Equity Interest/Assets Purchased</u> | <u>Roll-Up Value</u> |
|---|---|---|
| CPOG 2017 LLC | 97.0588% equity interest on fully-diluted basis | $12,100,000[1] |
| CPC-Cravens Corp. | 100% equity interest on fully-diluted basis | $19,500,000[1] |
| Navesink Cravens LLC | 100% equity interest on fully-diluted basis | $19,500,000[1] |
| Josh D Brands (seller entity name to be determined) | All intellectual property, including the trademarks for Josh D Brands and relating licensing rights | $6,000,000 |

(1)    The values set forth in this Schedule II relating to equity interests represent the value attributed to the percentage interest listed herein and not to the entire entity.  In the event that the Company purchases a lesser percentage interest, the Roll-Up Value will be reduced proportionally.

FILED DATE: 12/11/2020 2:41 PM    2020L013307

## SCHEDULE III

### Valuation Amounts

| Notes[1] | Valuation Amount |
|---|---|
| The first $5,000,000 in original principal amount of Notes | $84,000,000 |
| The second $5,000,000 in original principal amount of Notes | $98,000,000 |
| The second $5,000,000 in original principal amount of Notes | $112,000,000 |

(1)    The order of the Notes shall be determined based on the dates when the Company receives the full purchase price amounts from each Holder with respect to the Note(s) to be purchased by such Holder.  To the extent a Note falls into two different categories, the Valuation Amount shall be adjusted *pro rata* (for example, if the Company has issued $4,500,000 of Notes and thereafter issues a subsequent Note for $1,000,000, the Valuation Amount for that subsequent note would be $91,000,000).

FILED DATE: 12/11/2020 2:41 PM   2020L013307

## EXHIBIT A

Form of Convertible Note

[Attached]

FILED DATE: 12/11/2020 2:41 PM    2020L013307

THIS NOTE AND THE SECURITIES ISSUABLE UPON CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY APPLICABLE STATE SECURITIES LAWS.  THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THE SECURITIES UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED OR UNLESS SOLD PURSUANT TO RULE 144 OF SUCH ACT AND APPLICABLE STATE SECURITIES LAWS.

## THE CALYX PG HOLDINGS, LLC

### CONVERTIBLE PROMISSORY NOTE

August 20, 2018

$[_____].00

Las Vegas, Nevada
July [_], 2018

The Calyx PG Holdings, LLC, a Delaware limited liability company (the "**Company**"), with a principal office located at 2251 N. Rampart Blvd, #370, Las Vegas, NV 89128, for value received, hereby promises to pay to [ Naxos Holdings LLC ] with an address at [4306 Shadowbrooke Ct, Ft Collins CO], or its registered assigns (the "**Holder**"), the principal amount of [two hundred fifty thousand] ($[250,000]) (such amount, or such portion thereof which remains outstanding from time to time hereunder subsequently referred to as the "**Principal Amount**"), together with single interest accruing at the rate of ten percent (10%) per annum.

This Note is one of a series of convertible notes (the "**Notes**") issued pursuant to that certain Convertible Note Purchase Agreement, dated as of [Date] August 20, 2018 (the "**Agreement**"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement. All the Notes are *pari passu* such that all Notes rank equally and no payments shall be made under this Note unless a pro rata payment is simultaneously made under all other Notes.

The following is a statement of the rights of the Holder of this Note and the conditions to which this Note is subject, and to which the Holder, by the acceptance of this Note, agrees:

1.    Maturity Date.  Subject to **Section 2** hereof, a single payment of the then outstanding Principal Amount, plus accrued interest thereon determined in accordance with the first paragraph of this Note, shall be due twenty-four (24) months from the date of this Note (the "**Maturity Date**").

1.1    Default.  Any of the following events shall constitute an "**Event of Default**", unless waived by holders of a majority of the aggregate principal amount outstanding on all Notes (the "**Majority Holders**"):  (a) the Company's execution of a general assignment for the benefit of creditors; (b) the filing by or against the Company of a petition in bankruptcy or any petition for relief under the federal bankruptcy act or the continuation of such petition without dismissal for a period of ninety (90) days or more; or (c) the appointment of a receiver or trustee to take possession of substantially all of the property or assets of the Company.

1.2    Remedies Upon Default.  Following an Event of Default:

(a)    The Holder shall have (i) all rights and remedies granted to it under this Note and the Agreement.  All such rights and remedies and the exercise thereof shall be cumulative.  No exercise of any such rights and remedies shall be deemed to be exclusive or constitute an election of remedies.

EXHIBIT C

DocuSign Envelope ID: 37747922-9D46-4274-92BB-902402865FD8

FILED DATE: 12/11/2020 2:41 PM    2020L013307

(b)    Payment of the outstanding Principal Amount, together with all accrued and unpaid interest thereon determined in accordance with the first paragraph of this Note shall, at the option of the Majority Holders, become immediately due and payable without notice or demand.

No Event of Default may be waived or shall be deemed to have been waived except by an express notice delivered by the Majority Holders to the Company in accordance with **Section 9**, and any such waiver shall be applicable only to the specific Event(s) of Default expressly identified in such notice and shall not be deemed to apply to any other or subsequent Event of Default.  The Majority Holders may grant or withhold any such waiver in the sole exercise of their discretion, and may condition such waiver upon the payment by the Company of a premium or the acceptance of other terms and conditions under this Note or the Agreement.  No course of dealing by the Holder or the failure, forbearance or delay by the Majority Holders in exercising any of their rights or remedies under this Note or the Agreement shall operate as a waiver of any Event of Default or of any right of the Holder hereunder.

2.    <u>Conversion</u>.  This Note and any amounts due hereunder will be convertible into equity interests of the Company in accordance with the terms of **Section 4** of the Agreement.  Upon conversion of this Note, the Company will be forever released from all of its obligations and liabilities under this Note with regard to that portion of the Principal Amount and accrued interest being converted including, without limitation, the obligation to pay such portion of the Principal Amount and accrued interest.

3.    <u>Treatment of Note</u>.  To the extent permitted by generally accepted accounting principles, the Company will treat, account and report this Note as debt and not equity for accounting purposes and with respect to any returns filed with federal, state or local tax authorities.

4.    <u>Prepayment</u>.   The Company shall not have the right to prepay all or a portion of this Note at any time before the Maturity Date except as provided in **Section 5** of the Agreement.

5.    <u>Security</u>.   This Note is a general unsecured obligation of the Company.

6.    <u>Priority</u>.   This Note is subordinated in right of payment to all current and future indebtedness of the Company for borrowed money (whether or not such indebtedness is secured) to banks, commercial finance lenders or other institutions regularly engaged in the business of lending money (the "**Senior Debt**"). The Company hereby agrees, and by accepting this Note, the Holder hereby acknowledges and agrees, that so long as any Senior Debt is outstanding, upon notice from the holders of such Senior Debt (the "**Senior Creditors**") to the Company that an event of default, or any event which the giving of notice or the passage of time or both would constitute an event of default, has occurred under the terms of the Senior Debt (a "**Default Notice**"), the Company will not make, and the Holder will not receive or retain, any payment under this Note. Nothing in this paragraph will preclude or prohibit the Holder from receiving and retaining any payment hereunder unless and until the Holder has received a Default Notice (which will be effective until waived in writing by the Senior Creditors) or from converting this Note or any amounts due hereunder into equity securities of the Company.

2

DocuSign Envelope ID: 37747922-9D46-4274-B3DB-902402865FD8

7.      <u>No Stockholder Rights</u>.  Nothing contained in this Note shall be construed as conferring upon the Holder the right to vote or to consent or to receive notice as a stockholder or member in respect of meeting of stockholders or members for the election of directors of the Company or any other matters or any rights whatsoever as a stockholder of the Company; and no dividends shall be payable or accrued in respect of this Note or the interest represented hereby or the securities obtainable hereunder upon conversion until, and only to the extent that, this Note shall have been so converted in accordance with the terms hereof.

8.      <u>Recourse</u>.  The Holder agrees that no officers, directors, managers, members or stockholders of the Company shall have any personal liability with respect to the obligations of the Company under this Note or any agreements related to this Note.

9.      <u>Notice</u>.  Any notice, request or other communication required or permitted hereunder shall be in writing and shall be delivered in accordance with **Section 9.2** of the Agreement.

10.     <u>Waiver and Amendment</u>.  Any provision of this Note may be amended, waived or modified only in accordance with **Section 9.4** of the Agreement.

11.     <u>Restrictions on Transfer of this Note</u>.  No transfers of the Note, or the securities it is convertible into, or any portion hereof or thereof, may be made by the Holder without the prior written consent of the Company, which consent may be withheld in the Company's sole discretion. The rights and obligations of the Company and the Holder shall be binding upon and benefit their respective successors, permitted assigns, heirs, administrators and permitted transferees.

12.     <u>Payment</u>.  Any cash payments of the Principal Amount will be made by check or wire transfer in immediately available United States funds sent to the Holder at the address or to the account furnished to the Company for that purpose.

13.     <u>Governing Law; Jurisdiction</u>.  The provisions of **Section 9.7** of the Agreement shall apply to this Note.

14.     <u>Headings; References</u>.  All headings used herein are used for convenience only and shall not be used to construe or interpret this Note.  Except where otherwise indicated, all references herein to Sections refer to Sections hereof.  All words used in this Note will be construed to be of such gender or number as the circumstances require.

15.     <u>Usury</u>.  This Note is hereby expressly limited so that in no event whatsoever shall the amount paid or agreed to be paid to the Holder hereunder exceed that permissible under applicable law.  If at any time the performance of any provision of this Note involves a payment exceeding the limit that may be validly charged under applicable law then the obligation to be performed shall be automatically reduced to such limit.

*[Signature Page to Follow]*

3

DocuSign Envelope ID: 37747922-9D46-427A-92BB-902402865FD8

**IN WITNESS WHEREOF**, the Company has executed this Note as an instrument under seal as of the date and year first written above.

THE CALYX PG HOLDINGS, LLC

By: _____

Name: Howard Keum

Title: Manager

4843-4194-9037.1

4

FILED DATE: 12/11/2020 2:41 PM    2020L013307

Naxos Holdings LLC

**THE CALYX PG HOLDINGS, LLC**

**CONVERTIBLE NOTE PURCHASE AGREEMENT**

8/24/2018 8:28:06 AM PDT

CONVERTIBLE NOTE PURCHASE AGREEMENT, dated as of  [Date]_____ (this "**Agreement**"), is entered into by The Calyx PG Holdings, LLC, a Delaware limited liability company with offices located at 2251 N. Rampart Blvd, #370, Las Vegas, NV 89128 (the "**Company**") and the persons listed on **Schedule I** attached hereto (the "**Investors**").

PRELIMINARY STATEMENT

The Company is conducting a round of financing, raising up to $15,000,000 in the form of unsecured convertible promissory notes (each individually a "**Note**" and collectively, the "**Notes**", with each registered owner of a Note being sometimes referred to as a "**Holder**") that can be convertible into equity in the Company as more specifically set forth herein.

TERMS AND CONDITIONS

NOW, THEREFORE, in consideration of their mutual covenants set forth herein, the Company and the Investors agree as follows:

1.  Authorization of Notes. Prior to the Initial Closing (as defined in **Section 3.1**), the Company shall have authorized the issuance and sale of Notes of not more than Fifteen Million Dollars ($15,000,000) in original principal amount. The Notes shall be convertible into equity in the Company, all as set forth, and subject to the provisions of, the form of Convertible Note attached as **Exhibit A** and incorporated herein.

2.  Sale and Issuance of Notes. At the Initial Closing, and thereafter at one or more subsequent Closings, the Company shall sell and issue to each Investor, and each Investor shall purchase and acquire from the Company, upon the terms and conditions set forth herein, a Note in the original principal amount as set forth on the Signature Page (defined below) of such Investor attached hereto (which amount shall thereafter be entered by the Company on **Schedule I** opposite such Investor's name) at a purchase price equal to such original principal amount.  Each Investor's obligations hereunder with respect to the purchase of a Note as set forth herein shall be several, and not joint.

3.  Closing of Sale of Notes.

3.1  Closings. The closings with respect to the transactions contemplated hereby (each a "**Closing**") shall take place on such one or more dates (each a "**Closing Date**") as may be determined by the Company either (i) until the Company shall have effectuated Closings for not more than $15,000,000 in original principal amount of the Notes, or (ii) until the Company shall have determined, in its sole discretion, that the offering of the Notes made by this Agreement shall have terminated.  The Initial Closing shall take place on the date hereof or such date when the Company shall have subscribed for Closings of not less than $5,000,000 in original principal amount (the "**Initial Closing**").  Each Closing shall be held at the offices of the Company or remotely via the exchange of documents and signatures. Each Investor who desires to purchase a Note hereunder shall subscribe thereto by completing, executing and delivering to the Company the signature page attached to this Agreement (each a "**Signature Page**") and the Accredited Investor Questionnaire attached hereto as **Form A**, together with payment by check drawn on good funds or by wire transfer of immediately available funds of the original principal amount of the Note so purchased.  As each Closing is completed, the Signature Pages of Investors purchasing Notes at such Closing shall be attached to this Agreement, and **Schedule I**

DocuSign Envelope ID: 37747922-9D46-4274-B2BB-902402865ED8

shall be amended accordingly. The Company may accept or reject, in whole or in part and at its sole discretion, any offer by an Investor to purchase a Note.

      3.2    <u>Issuance and Delivery of Note</u>. As of the date of each Closing, the Company shall issue and deliver to each Investor an executed Note in the form of **Exhibit A** in the original principal amount as is set forth on the Signature Page of such Investor delivered to the Company hereunder (which amount shall thereafter be entered by the Company on Schedule I opposite such Investor's name). The rights of each Investor with respect to such Investor's Note shall be as set forth in the Note and this Agreement.

    4.    <u>Conversion of Notes</u>. In accordance with the terms and conditions set forth in the Notes, the entire amount of outstanding principal and accrued interest under each Note shall be convertible in the event of the closing of a Qualified Offering, as follows:

      4.1    <u>Mandatory Conversion</u>. In the event that the Company completes an offering of equity interests of the Company resulting in aggregate gross proceeds to the Company of at least $10,000,000 (excluding conversion of the Notes or other convertible notes) (a "**Qualified Offering**") prior to the Maturity Date (as defined in the Notes), all Notes shall automatically and simultaneously with the closing thereof be converted (which such conversion shall be mandatory as to all Notes outstanding at the time of such Qualified Offering) into units of equity of the Company issued to purchasers in such Qualified Offering, at a price per unit equal to the per unit price paid by purchasers for such units less a discount of twenty percent (20%), and otherwise on the same economic terms and conditions applicable to the units of equity interest purchased by purchasers in such Qualified Offering, provided, however, that as further protection to the Holders, upon a Qualified Offering, the valuation of the Company shall not exceed the sum of (i) $140,000,000 pre-money valuation plus (ii) to the extent the Company has purchased any equity interests in or, as applicable, the assets of the companies set forth on **Schedule II** attached hereto (the "**Roll-Up Interests**"), the value set forth next to each such purchased interest on **Schedule II** (the "**Roll-Up Value**"), for the sole purpose of calculating the amount of equity to which the Notes are converted into to reflect pre-investment dilution expectations and requirements by the Holders.

      4.2    <u>Optional Conversion</u>. If the Company does not consummate a Qualified Offering prior to the Maturity Date, the then outstanding principal amount, together with accrued interest, on the Notes may, at the election of the holders of a majority of the outstanding principal amount on all Notes (the "**Majority Holders**"), be either (i) converted into the most senior equity then issued by the Company, at the then current valuation of the Company, as determined in good faith by the Company, provided, however, that as further protection to the Holders, the valuation of the Company shall not exceed the sum of (a) the applicable amount with respect to the Notes being converted as set forth on **Schedule III** hereto (the "**Valuation Amount**") plus (b) the aggregate Roll-Up Value for any Roll-Up Interests purchased by the Company on or prior to such conversion, for the sole purpose of calculating the amount of equity to which the Notes are converted into or (ii) paid in full within thirty (30) days following receipt by the Company of such election of the Majority Holders.

      4.3    <u>Change of Control</u>. In the event that the Company effects a Change of Control (as defined below) prior to the Maturity Date, then each Holder shall surrender its Note for, at the election of the Majority Holders, either (i) repayment of outstanding principal and interest under the Notes or (ii) the conversion of the Notes into the most senior equity class or series of securities then issued by the Company at a pre-conversion valuation equal to the sum of (a) the applicable Valuation Amount with respect to the Notes being converted plus (b) the aggregate Roll-Up Value for any Roll-Up Interests purchased by the Company on or prior to the date of such conversion. "**Change of Control**" means (i) the acquisition of all or substantially all of the assets, or all or substantially all of the securities, of the Company by any person, other than a wholly-owned subsidiary of the Company, and excluding a

FILED DATE: 12/11/2020 2:41 PM    2020L013307

DocuSign Envelope ID: 37747922-9D46-4274-B3BB-902402865FD8

transaction involving an exchange of equity interest in which members of the Company prior to the transaction will own, by virtue of their pre-acquisition equity interest (or equity interest received in consideration thereof), a majority of the voting power of the entity surviving the transaction (or the company which following such transaction is the parent company, if applicable), (ii) the merger or consolidation of the Company by, with or into other person, other than a wholly-owned subsidiary of the Company, and excluding a transaction in which members prior to the transaction will own, by virtue of their pre-acquisition equity interest (or equity interest received in consideration thereof), a majority of the voting power of the entity surviving the transaction (or the company which following such transaction is the parent company, as applicable), or (iii) the Company's first underwritten public offering of shares of common stock pursuant to an effective registration statement under the Securities Act of 1933, as amended.

In all events of conversion of Notes and as a condition thereto, which only the Company can waive, Holders agree to execute all documents executed by shareholders or members of the Company holding similar equity to which the Note is converted, and Holders hereby irrevocably appoint the Company and its designated officers to execute such documents on behalf of the Holders.

5. <u>Permitted Prepayment</u>. Company shall not have the right to prepay all or any portion of the Note at any time before the Maturity Date except as provided in this Section 5. Company may prepay any portion up to the entire principal balance of the Note, together with all accrued and unpaid interest thereon to the date of prepayment, provided that the Holder shall thereafter have a right to purchase the most senior equity securities of the Company based on the then current valuation of the Company, as determined in good faith by the Company, provided, however, that the valuation of the Company for such purpose shall not exceed the sum of (i) the applicable Valuation Amount with respect to the Notes originally issued to such Holder plus (ii) the aggregate Roll-Up Value for any Roll-Up Interests purchased by the Company on or prior to the date of such purchase; provided, however, that the Holder shall only be entitled to the rights in this Section 5 if the Holder exercises such rights before the Maturity Date.

6. <u>Representations and Warranties of the Company</u>. The Company hereby represents and warrants to the Investors as follows:

6.1     <u>Organization</u>. The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware; and has all requisite company power and authority to own and lease its property and to carry on its business as presently conducted and as proposed to be conducted.

6.2     <u>Capitalization</u>. The Company has issued membership units to five Members, which Members collectively hold a 100% percent equity interest in the Company as of the date hereof.

6.3     <u>Authorization of this Agreement and the Notes</u>. The execution, delivery and performance by the Company of this Agreement and the Notes and of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of the Company. This Agreement has been duly executed and delivered by the Company and constitutes a valid and binding agreement of the Company that is enforceable in accordance with its terms. As of the date of issue thereof, each of the Notes will constitute a valid and binding obligation of the Company that is enforceable in accordance with its terms. The execution, delivery and performance of this Agreement and the Notes, and the compliance with the provisions hereof and thereof by the Company, will not (i) conflict with or result in any breach of any of the terms, conditions or provisions of, or constitute (with due notice or lapse of time, or both) a default (or give rise to any right of termination, cancellation or acceleration) under (A) any agreement, document, instrument, contract, understanding, arrangement, note, indenture, mortgage or lease to which the Company is a party or under which the Company or any of its assets is

FILED DATE: 12/11/2020 2:41 PM    2020L013307

DocuSign Envelope ID: 37747922-9D46-427A-B3BB-902403865FD8

bound or affected, (B) the Company's Articles of Organization, or (C) the Company's Operating Agreement; or (ii) result in the creation of any lien, security interest, charge or encumbrance upon any of the properties or assets of the Company.

> 6.4 <u>Consents and Approvals</u>. No authorization, consent, approval or other order of, or declaration to or filing with, any governmental agency or body (other than filings required to be made under applicable federal or state securities laws) is required for the valid authorization, execution, delivery and performance by the Company of this Agreement or the Notes. The Company has obtained all other consents that are necessary to permit the consummation of the transactions contemplated hereby.

> 6.5 <u>Brokers</u>. No person or entity has or will have, as a result of the transactions contemplated by this Agreement, any right, interest or claim against or upon the Company or the Investors for any commission, fee or other compensation as a finder or broker because of any act or omission by the Company or by any agent of the Company.

> 6.6 <u>Sole Representations</u>. Except as expressly set forth in this **Section 6**, the Company makes no other representation or warranty in connection with the transactions contemplated by this Agreement.

> 7. <u>Representations and Warranties of the Investors</u>. Each of the Investors, severally and not jointly, represents and warrants to the Company as follows:

> 7.1 <u>Authorization</u>. The Investor has full power and authority to enter into this Agreement which, when executed and delivered by the Investor, will constitute the valid and legally binding obligation of the Investor, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

> 7.2 <u>Purchase for Investment</u>. The Investor is purchasing the Note, and if and when the Note is converted will acquire equity interest in the Company, for investment for the account of the Investor and not for the account of any other person, and not with a view toward resale or other distribution thereof. The Investor understands that the Note being purchased has not been, and when issued the equity interest issuable upon conversion will not be, registered under the Securities Act of 1933, as mended (the "**Securities Act**") and applicable state securities laws and, therefore, cannot be resold unless subsequently registered under the Securities Act and applicable state securities laws or unless an exemption from such registration is available. The Investor further understands and agrees that, until so registered or transferred pursuant to the provisions of Rule 144 under the Securities Act, the Note and all certificates evidencing any of the equity interest, whether upon initial issuance or upon any transfer thereof, shall bear a legend, prominently stamped or printed thereon, reading substantially as follows:

>> THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>ACT</u>"), OR APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY ONLY BE SOLD, PLEDGED, OR OTHERWISE TRANSFERRED PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS, OR PURSUANT TO AN EXEMPTION FROM THE REGISTRATION PROVISIONS OF THE ACT AND SUCH LAWS. ADDITIONAL CONDITIONS ARE IMPOSED BY THIS SECURITY AND THE AGREEMENT PURSUANT TO WHICH THIS

FILED DATE: 12/11/2020 2:41 PM    2020L013307

DocuSign Envelope ID: 37747922-9D46-427A-92BB-002402865FD8

SECURITY WAS SOLD, AND THE COMPANY MAY REFUSE TO THE
TRANSFER OF THIS SECURITY UNLESS SUCH CONDITIONS ARE FULFILLED.

The Investor understands and agrees that the Company does not have any present intention and is under no obligation to register the Note, the equity interest issuable upon conversion, whether upon initial issuance or upon any transfer thereof under the Securities Act and applicable state securities laws, and that Rule 144 may not be available as a basis for exemption from registration. The Investor acknowledges and agrees that the Company may condition the transfer of the Note, or the equity interest, upon the receipt of an opinion, satisfactory in form and substance to the Company and from counsel satisfactory to the Company, in each of such instances in the sole discretion of the Company, that such proposed transfer shall not result in the violation of any federal or state securities law.

7.3    Receipt of Information. The Investor or such Investor's representative, during the course of this transaction and prior to the purchase of the Note being purchased by the Investor hereunder, has had the opportunity to ask questions of and receive answers from representatives of the Company concerning the terms and conditions of the offering of the Notes and the business of the Company; and to obtain any additional information or documents relative to the Company, its business and an investment in the Company necessary to verify the accuracy of information provided by the Company relative to the business of the Company. The Investor or the Investor's representative has received and read or reviewed, and is familiar with, this Agreement, the form of the Note and all such additional information and documents provided to the Investor.

7.4    Sophistication of Investor. The Investor or the Investor's representative is capable of evaluating the merits and risks of the purchase of the Notes. The Investor has the capacity to protect his or her own interests in connection with the purchase of the Notes by reason of the Investor's business or financial experience or the business or financial experience of the Investor's representative (who is unaffiliated with and who is not compensated by the Company or any affiliate, directly or indirectly).

7.5    Risk of Investment. The purchase of a Note by the Investor is consistent with his or her general investment objectives. The Investor understands that the purchase of the Notes involves a high degree of risk and there is now no established market for the Company's Notes or equity interest and there is no assurance that any public market for the Notes or such equity interest will develop. The Investor has no present need for liquidity in connection with the funds being tendered by such Investor hereunder. The Investor can bear the economic risks of this investment and can afford a complete loss of his investment.

7.6    Accredited Investor. The Investor has completed and delivered to the Company herewith the Accredited Investor Questionnaire attached hereto as Form A acknowledging, among other matters, that he, she or it is an "**Accredited Investor**," as that term is defined in Rule 501 of Regulation D promulgated under the Securities Act.

7.7    No Commissions. No person or entity has or will have, as a result of the transactions contemplated by this Agreement, any right, interest or claim against or upon the Company or the Investor for any commission, fee or other compensation as a finder or broker because of any act or omission by the Investor or by any agent of the Investor.

7.8    No General Solicitation.  Neither the Investor, nor any of its officers, directors, employees, agents, stockholders or partners has either directly or indirectly, including through a broker or finder (a) engaged in any general solicitation, or (b) published any advertisement in connection with the offer and sale of the Notes.

FILED DATE: 12/11/2020 2:41 PM    2020L013307

DocuSign Envelope ID: 37747922-9D46-4274-B3DB-902402865FD8

7.9     Residence.  If the Investor is an individual, then the Investor resides in the state or province identified in the address of the Investor set forth on the Signature Page; if the Investor is a partnership, corporation, limited liability company or other entity, then the office or offices of the Investor in which its principal place of business is identified in the address or addresses of the Investor set forth on the Signature Page.

8.     Closing Conditions.

8.1     Conditions to Obligations of the Investors. It shall be a condition precedent to the obligations of any Investor to be performed at the Initial Closing or at the subsequent Closing in which such Investor participates that:

(i)     Investors received all documents which they may reasonably have requested in connection with such transactions.

(ii)     All representations and warranties of the Company shall be accurate, correct and complete on the date hereof.

(iii)     There shall have been no material adverse change in the financial condition of the Company between the date of the Signature Page for such Investor and the date of the Closing in which such Investor shall participate.

8.2     Conditions to Obligations of the Company. It shall be a condition precedent to the obligations of the Company hereunder to be performed at the Initial Closing or at any subsequent Closing that:

(i)     The Company shall have received the check, wire transfer or other funds or consideration described in **Section 3** to be delivered to the Company in consideration of the issuance of the Notes at such closing.

(ii)     All representations and warranties of the Investors shall be accurate, correct and complete on the date of the Closing in which such Investors participate.

(iii)     Notwithstanding anything in this Agreement to the contrary, the Company has absolute discretion as to whether or not to accept an investment from the Investor.

9.     Miscellaneous.

9.1     Successors and Assigns. Except as otherwise expressly provided herein, this Agreement shall bind and inure to the benefit of the Company, the Investors, the respective permitted successors and assigns of the Investors and the permitted successors and assigns of the Company. The Company is authorized to assign this Agreement in the event of sale, merger, consolidation, reorganization, consolidation, share exchange, or like transaction,  involving all or substantially all of its assets or equity, provided the assignee agrees in writing to be bound by the provisions of this Purchase Agreement. The Holder may only assign this Agreement upon the prior written consent of the Company and by surrender thereof at the principal office of the Company, duly endorsed by, or accompanied by a written instrument of transfer duly executed by, the registered Holder of this Agreement or his attorney duly authorized in writing and the Note, as specified therein.

9.2     Notices. All notices, offers, acceptances, requests and other communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered, sent by

DocuSign Envelope ID: 37747922-9D46-427A-92DB-902402865EB8

FILED DATE: 12/11/2020 2:41 PM    2020L013307

confirmed fax transmission, electronic mail, or mailed by certified or registered mail to the Company and the Investors at the addresses set forth in their signature lines. If personally delivered or sent by confirmed fax transmission, or electronic mail, such notice shall be deemed received upon such delivery, if mailed by overnight courier such notice shall be deemed received one (1) day after such mailing, and if mailed by certified or registered mail, such notice shall be deemed received three (3) days after such mailing. Each party is responsible to update its own address in the manner prescribed above.

9.3     <u>Entire Agreement</u>. This Agreement and the other writings referred to herein or delivered pursuant hereto which form a part hereof contain the entire agreement among the parties with respect to the subject matter hereof and supersede all prior and contemporaneous arrangements or understandings, whether written or oral, with respect thereto.

9.4     <u>Changes</u>. The terms and provisions of this Agreement may not be modified or amended, or any of the provisions hereof waived, temporarily or permanently, except pursuant to a writing executed by duly authorized representatives of the Company and the Majority Holders.

9.5     <u>Counterparts</u>. This Agreement may be executed in any number of counterparts all of which together shall constitute one and the same instrument. The execution and delivery to the Company of a Signature Page in the form annexed to this Agreement by any Investor who shall previously have been furnished the final form of this Agreement (other than **Schedule I**) shall constitute the execution and delivery of this Agreement by such Investor. All exhibits, schedules and annexes attached hereto are part of this Agreement and are incorporated herein by reference. Electronic and fax signatures shall be deemed and accepted as originals.

9.6     <u>Severability</u>. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction., and such unenforceable provision shall be interpreted to the fullest extent permitted by law.

9.7     <u>Governing Law</u>. This Agreement and any dispute arising under or related to this shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to its conflict of laws provisions. Any dispute arising under or related to this Agreement shall be brought before a single arbitrator appointed by the American Arbitration Association ("**<u>AAA</u>**") under the auspices and commercial arbitration rules of the AAA to be held in Las Vegas, NV.

9.8     <u>Nouns and Pronouns</u>. Whenever the context may require, the singular form of nouns and pronouns shall include the plural and vice versa. The section headings throughout this Agreement are for convenience and reference only, and the words contained therein shall in no way be held to explain, modify, amplify, or aid in the interpretation, construction or meaning of the provisions of this Agreement.

**[SIGNATURE PAGE FOLLOWS]**

FILED DATE: 12/11/2020 2:41 PM   2020L013307

## COUNTERPART SIGNATURE PAGE
## TO
## CONVERTIBLE NOTE PURCHASE AGREEMENT

IN WITNESS WHEREOF, the Company and the Investors have executed this Agreement as of the date first above written.

THE CALYX PG HOLDINGS, LLC                  Investors

_____

Name: Howard Keum                               See Attached Signature Pages
Title:  Manager
Address:  c/o The Calyx PG Holdings, LLC
                2251 N. Rampart Blvd, #370
                Las Vegas, NV 89128

FILED DATE: 12/11/2020 2:41 PM    2020L013307

## COUNTERPART SIGNATURE PAGE
## TO
## CONVERTIBLE NOTE PURCHASE AGREEMENT

By execution of this Signature Page, the undersigned Investor irrevocably agrees that, upon the acceptance of the Company, the Investor shall become a party to and be bound by the provisions of the Convertible Note Purchase Agreement (the "**Purchase Agreement**") to which this Signature Page is appended, a counterpart of which has been furnished to the undersigned.  Upon acceptance by the Company, the undersigned hereby authorizes the Company to append this Signature Page to a counterpart of the Purchase Agreement as evidence thereof. The undersigned hereby subscribes for the purchase of a Note (as defined in the Purchase Agreement) in the original principal amount specified below.

**INVESTOR:**

Naxos Holdings LLC
16848174D298437...

_____
(Signature)

Naxos Holdings LLC

_____
(Printed Name)

Naxos Holdings LLC, 4306 Shadowbrooke Ct

_____
(Street Address of Residence)

Fort Collins, CO 80526

_____
(City or Town)  (State)  (Zip Code)

9704435710

_____
(Telephone Number)

_____
(Facsimile Telephone Number)

_____
(Email Address)

*Each Investor must include the Original Principal Amount of Note Subscribed For below:*

250,000

$ _____

**Accepted:**
**THE CALYX PG HOLDINGS, LLC**

Howard Keum
9689D9826236425

By:_____
Name: Howard Keum, Manager

8/23/2018 5:59:40 PM PDT
Date: _____

DocuSign Envelope ID: 37747922-9D46-4274-93BB-092102865FD8

# FORM A
# ACCREDITED INVESTOR QUESTIONNAIRE

__Accredited Investor Status__.  To comply with Federal or state securities laws applicable to this Offering, the Company may need, and therefore asks you to provide, certain information.  Please check all the lines below that apply to indicate whether you fit within any of the following definitions of an "accredited investor":

___x___  Any natural person whose net worth, or joint net worth, with that person's spouse, excluding the value of the primary residence of such natural person, at the time of his or her purchase, exceeds $1,000,000.00.  For purposes of this item, "net worth" means the excess of total assets at fair market value (including personal and real property, but excluding the estimated fair market value of a person's primary home) over total liabilities. Total liabilities excludes any mortgage on the primary home in an amount of up to the home's estimated fair market value as long as the mortgage was incurred more than 60 days before the Securities are purchased, but includes (i) any mortgage amount in excess of the home's fair market value and (ii) any mortgage amount that was borrowed during the 60-day period before the closing date for the sale of Securities for the purpose of investing in the Securities.

_____  A natural person who had an individual income in excess of US $200,000 in each of the two most recent years or joint income with that person's spouse in excess of US $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year.

_____  An organization described in Section 501(c)(3) of the Internal Revenue Code, a corporation, a Massachusetts or similar business trust or a partnership, in each case, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of US $5,000,000.

_____  A director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer.

_____  a trust with total assets in excess of US $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of the Securities Act of 1933;

_____  An entity in which all of the equity owners are accredited investors.

_____  A private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

_____  A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

_____  An investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act.

_____  A bank as defined in Section 3(a)(2) or a savings and loan association or other institution defined in Section 3(a)(5)(A) of the Securities Act of 1933 acting in either an individual or fiduciary capacity.

_____  An insurance company as defined in Section 2(13) of the Securities Act of 1933.

_____  Any self-directed employee benefit plan if the investment decisions are made solely by accredited investors.

_____  An employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 whose investment decision is made by a fiduciary which is either a bank, savings and loan association, insurance company, or registered investment advisor, or whose total assets exceed US $5,000,000, or, if a self-directed plan, a plan whose investment decisions are made solely by persons who are accredited investors.

_____  Any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

_____  Any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of US $5,000,000.

_____  None of the above.

_____

Signature of Subscriber or Duly Authorized
Representative
Dated this ____ day of _____, _____

DocuSigned by:
Napos Holdings LLC
8/24/2018 8:28:06 AM PDT

FILED DATE: 12/11/2020 2:41 PM   2020L013307

FILED DATE: 12/11/2020 2:41 PM   2020L013307

## THE CALYX PG HOLDINGS, LLC

## CONVERTIBLE NOTE PURCHASE AGREEMENT

## SCHEDULE I

(To be completed by the Company)

<u>Name and Address of Investor</u>          <u>Principal Amount of Note Purchased</u>

[On file with Company]

## SCHEDULE II

**Roll-Up Interests**

| Entity Name | Equity Interest/Assets Purchased | Roll-Up Value |
|---|---|---|
| CPOG 2017 LLC | 97.0588% equity interest on fully-diluted basis | $12,100,000[1] |
| CPC-Cravens Corp. | 100% equity interest on fully-diluted basis | $19,500,000[1] |
| Navesink Cravens LLC | 100% equity interest on fully-diluted basis | $19,500,000[1] |
| Josh D Brands (seller entity name to be determined) | All intellectual property, including the trademarks for Josh D Brands and relating licensing rights | $6,000,000 |

(1)     The values set forth in this Schedule II relating to equity interests represent the value attributed to the percentage interest listed herein and not to the entire entity.  In the event that the Company purchases a lesser percentage interest, the Roll-Up Value will be reduced proportionally.

DocuSign Envelope ID: 37747922-9D46-4274-83BB-902402865ED8

FILED DATE: 12/11/2020 2:41 PM    2020L013307

## SCHEDULE III

### Valuation Amounts

| Notes[1] | Valuation Amount |
|---|---|
| The first $5,000,000 in original principal amount of Notes | $84,000,000 |
| The second $5,000,000 in original principal amount of Notes | $98,000,000 |
| The second $5,000,000 in original principal amount of Notes | $112,000,000 |

(1)    The order of the Notes shall be determined based on the dates when the Company receives the full purchase price amounts from each Holder with respect to the Note(s) to be purchased by such Holder. To the extent a Note falls into two different categories, the Valuation Amount shall be adjusted *pro rata* (for example, if the Company has issued $4,500,000 of Notes and thereafter issues a subsequent Note for $1,000,000, the Valuation Amount for that subsequent note would be $91,000,000).

FILED DATE: 12/11/2020 2:41 PM   2020L013307

# **EXHIBIT A**

Form of Convertible Note

[Attached]

**Misty Cygan**

FILED DATE: 12/11/2020 2:41 PM    2020L013307

| | |
|---|---|
| **Subject:** | FW: Craig/Justin Amendment to 2018 Convertible Notes. |
| **Attachments:** | Calyx Peak Noteholder Letter (Ed Schmults).pdf; Calyx - Amendment to Convertible Note Purchase Agreement (tranches 1-3).pdf |

---------- Original Message ----------
From: Howard Keum <howard.keum@calyxpeak.com>
To: 'Justin LAST_NAME' <justin.funk@comcast.net>, 'Craig Funk' <cwfunk@intltoner.com>
Date: 06/12/2020 9:27 AM
Subject: Craig/Justin Amendment to 2018 Convertible Notes.

Hi Craig/Justin,

We are sending this letter to all the investors in the Calyx Peak 2018 Convertible Notes. It is a proposed amendment to extend and align the maturity dates of the Convertible Notes.

Please review and let us know if you would like to get on a call for further detail. We would be more than happy to do so.

If you would like to vote in favor please counter execute by signing and sending it back or we can arrange to sign via docusign.

Howie

---

Attached is a proposed amendment to the Calyx Peak 2018 Convertible Notes that you are invested in. The Company is seeking to improve its cash flow and strengthen its balance sheet by offering to revise the terms of the notes – specifically by extending and aligning the maturity dates in exchange for offering the investors a lowered conversion price.

Please see our bullets explaining the purpose, reasons, and terms of the proposed amendments to your Calyx Peak 2018 Convertible Notes.

- **Why we are sending this letter**
    - In the series of convertible note holders, the maturity dates do not match up because each investor's maturity date was set to the two-year anniversary of the date of funding. We believe it is in the best interest of all the convertible note holders to get the

EXHIBIT D

maturity dates aligned. Proposed new maturity date for all holders will be December 31, 2023.

- **Current repayment challenges**
  - The Company is not in a position to repay the notes starting in August 2020 as it would cause a forced insolvency. The capital market for cannabis companies remains difficult so refinancing is currently not an option.
- **Updates on the Company**
  - The Company had a signed agreement with a large ($25mn) equity investor due to fund in mid-March. This money was cancelled due to the market uncertainties caused by the oil shock and COVID 19.
  - Q1 sales results in California were 11% over plan. Q2 is expected to hit plan.
  - Operational improvements are significant and on-going:
    - California sales are down 10% vs the first four months of 2019 but we are only using half the space as we resolve local permitting issues.
    - Expenses in our California Greenhouse facility are down 48% from the first four months of 2019; payroll is down 56% over the same period.
  - COVID 19 has proven to be a good market environment for cannabis. Cannabis sales and bulk pricing have been healthy as many states have deemed cannabis businesses an essential service.
  - We are still going through restructuring and are making progress on paying down short-term debt obligations that need to be satisfied.
  - Medium and long-term view is positive:
    - We expect California to be operationally cash flow positive in Q3 2020
    - Massachusetts and Missouri operations moving through licensing and fund-raising
- **Revised terms being offered**
  - Voting in favor of the new maturity date (Dec 31, 2023) will prevent insolvency and protect your investment.
  - Investors will receive a lower, fixed maximum conversion price that in practice represents an additional 20% discount from the previous maximum established conversion share price (reflecting the conversion valuation of each note series divided by the at-then fully diluted share count). Assuming that the maximum conversion price is reached, this additional discount will result in the convertible note holders receiving a minimum of 25% more equity upon conversion compared to the existing conversion mechanism.
  - Each noteholder will have the option to have the principal and interest on its notes repaid following the maturity date via the payment plan described or convert to equity at the maturity date in the event there is no Change of Control or IPO by then.

We believe approval of this amendment by the majority of noteholders will help to prevent insolvency and give us time to continue to complete permitting in California, build out Missouri and Massachusetts and benefit from the significant cash flow these businesses will produce, help protect overall investor value, align maturity dates for the investors in the series and reward the investor longer term with the new max conversion share price.

Please feel free to contact us if you would like to set up a call.

FILED DATE: 12/11/2020 2:41 PM   2020L013307

*Ed/ M. Sats*

Ed Schmults

CEO – Calyx Peak, Inc

FILED DATE: 12/11/2020 2:41 PM 2020L013307

## Howard Keum

Chief Corporate Development Officer
**Calyx Peak Companies**
Office: +1.702.605.2346
Mobile: +1.917.657.6011
howard.keum@calyxpeak.com

www.calyxpeak.com

**Disclaimer:**
CONFIDENTIAL: This e-mail, including its contents and attachments, if any, are confidential. If you are not the named recipient please notify the sender and immediately delete it. You may not disseminate, distribute, or forward this e-mail message or disclose its contents to anybody else.

3

## Misty Cygan

FILED DATE: 12/11/2020 2:41 PM   2020L013307

**Subject:**                    FW: RE: Realignment and extension of Convertible Note Tranches 1-3

---------- Original Message ----------
From: Justin LAST_NAME <justin.funk@comcast.net>
To: Michael Bang <michael.bang@calyxpeak.com>
Cc: Howard Keum <howard.keum@calyxpeak.com>
Date: 08/30/2020 9:18 PM
Subject: RE: Realignment and extension of Convertible Note Tranches 1-3

I have a contractual right to information about who my co-investors are.  The amendment and modification of the original note reinforces that right- and further, to establish that the existing debt holders have actually agreed.  I need not take your word on that.

If you had wanted to maintain as private the identity of the various investors it could have- and should have- stated this in the contract.  Instead, it specifically staid I am entitled to copies of the various signature sheets (not "redacted copies").

We are suing for breach of contract, and as part of that will be detailing the objectively egregious behavior of the company.  As you know, that will be made public to existing to prospective investors.

On 08/28/2020 10:06 AM Michael Bang <michael.bang@calyxpeak.com> wrote:

Hello Justin,

I wanted to follow up on your email dated August 25, 2020. As you are aware Calyx Peak Inc is a private company and as such take the privacy of our investors very seriously. As such it is Calyx Peak Inc's policy not to disclose personal information of our Investors.

We can provide a redacted version of Schedule I at your request. Please let us know. Additionally, if you would like to jump on a call to discuss anything further we would be happy to do so at your convenience.

Regards,

**EXHIBIT E**

Michael

FILED DATE: 12/11/2020 2:41 PM    2020L013307

**From:** Justin LAST_NAME <justin.funk@comcast.net>
**Sent:** Tuesday, August 25, 2020 8:06 PM
**To:** Michael Bang <michael.bang@calyxpeak.com>
**Cc:** Howard Keum <howard.keum@calyxpeak.com>
**Subject:** Re: Realignment and extension of Convertible Note Tranches 1-3

Michael & Howie-

I'm requesting the identity and contact information of all of the other note holders within 24 hours.

The penultimate sentence of section 3.1 states "As each closing is completed, the Signature Pages of Investors purchasing Notes at such Closing shall be attached to this Agreement and Schedule I and shall be amended accordingly." Given the defined terms and the plural use of many of them, our formal legal interpretation is that I am entitled access to all of the signature pages of all of the investors bound by the agreement.

Failure to provide affords us a legal basis to sue for it, including but not limited to breach of contract.

As an alternative, you are welcome to buy out the notes of myself and Craig (Funk) for principal + interest when they expire.

Thanks.

Justin Funk

Signed 7:05pm CST

FILED DATE: 12/11/2020 2:41 PM  2020L013307

On 08/25/2020 3:56 PM Michael Bang <michael.bang@calyxpeak.com> wrote:

Hello Justin,

We would like to inform you that holders of a majority-in-interest of Calyx Peak's Convertible Notes (Tranches 1-3) have voted to realign and extend the maturity date of all notes in those tranches to December 31, 2023 and to further modify the notes as described below.

The alignment and extension of the maturity dates for Convertible Note Tranches 1-3 was approved because:

a) maturity dates of each convertible note varied (the new maturity date for all notes is December 31, 2023)

b) Calyx Peak was and still is not in a position to repay the Notes starting in August 2020.

In exchange for realignment and extension of the maturity dates Investors will receive:

i) a lower, fixed maximum conversion price that in practice represents at a minimum an additional 25% more equity upon conversion from the previous maximum established conversion share price (as described in Schedule III of the Amendment to Convertible Note Purchase Agreement and Convertible Promissory Note, a copy of which is attached)

ii) in the event that no change of control or initial public offering occurs by the maturity date of the notes, each noteholder will have the individual option to have the principal and interest on its notes repaid following the maturity date via the payment plan described in the amendment or to convert to equity under the terms of the note.

3

FILED DATE: 12/11/2020 2:41 PM   2020L013307

With the realignment and extension of the maturity dates for Calyx Peak's Convertible Note Tranches 1-3, noteholders have allowed Calyx Peak to restructure debt in a meaningful way and provided the company significant balance sheet flexibility. This flexibility has already allowed Calyx Peak to continue dispensary permitting efforts in California and moving the Missouri and Massachusetts opportunities forward. The reason we asked for the maturity date to be reset to December 31, 2023 are twofold. New businesses in California, Missouri, and Massachusetts will require at least one year of construction time in some cases and we would expect another 6-12 months for those businesses to become net cash flow positive. As such, we believe that Calyx Peak should be in a situation by end of 2023 to redeem debt obligations, including Convertible Note Tranches 1-3.

Please feel free to contract us if you have any questions or would like to set up a call. We have also attached the Amendment Agreement for reference.

Warmest regards,

Michael Bang

Chief Investment Officer

Calyx Peak Companies

1.647.290.7205

michael.bang@calyxpeak.com

## DISCLAIMER:

CONFIDENTIAL: This e-mail, including its contents and attachments, if any, are confidential. If you are not the named recipient please notify the sender and immediately delete it. You may not disseminate, distribute, or forward this e-mail message or disclose its contents to anyone else.

4